RICHARD F. BERGERON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bergeron v. Commissioner
Docket Nos. 3402-69, 3403-69, 3623-71.
United States Tax Court
T.C. Memo 1972-248; 1972 Tax Ct. Memo LEXIS 9; 31 T.C.M. (CCH) 1226; T.C.M. (RIA) 72248; December 20, 1972, Filed *9 (1) The petitioners, psychiatric residents, received stipends from the State Department of Hospitals during the period of their training. The stipends were granted on condition that the recipients perform 2 years of service for the department after completion of their training. Held, the stipends are not excludable scholarships or fellowship grants under sec. 117(a), I.R.C. 1954. (2) During the training period, two of the petitioners received additional grants which the respondent treated as excludable under sec. 117(a). Held, the petitioners were not candidates for a degree within the meaning of sec. 117(b), I.R.C. 1954. Ed. J. deVerges, Sr., and Patrick J. Browne, for the petitioners. Bruce A. McArdle, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The respondent determined the following deficiencies in the petitioners' Federal income taxes: Petitioner
Year
Amount
Richard F. Bergeron
1966
$ 731.02
Elodie B. Pons Braud
1966
1,534.33
Walter D. & Margaret E.
1965
793.17
Gregory
1966
1,551.97
Two issues remain for decision: (1) Did the stipends received by the petitioners while they participated in a program for training psychiatrists qualify as scholarships or fellowship grants excludable under section 117(a) of the Internal Revenue Code of 1954, [2] and (2) were the petitioners, while engaged in such program, candidates for a degree within the meaning of section 117(b)? *11 FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Richard F. Bergeron (Dr. Bergeron), maintained his legal residence in Baton Rouge, Louisiana, at the time his petition was filed in this case. The petitioner, Elodie B. Pons Braud (Dr. Braud), formerly Elodie B. Pons, maintained her legal residence in Metairie, Louisiana, at the time her petition was filed in this case. The petitioners, Walter D. g/regory (Dr. Gregory) and Margaret E. Gregory, were husband and wife, who maintained their legal residence in Seabrook, Texas, at the time their petition was filed in this case. Dr. Bergeron and Dr. Braud each filed an individual Federal income tax return for the year 1966 with the district director of internal revenue, New Orleans, Louisiana. Dr. and Mrs. Gregory filed joint Federal income tax returns for the years 1965 and 1966 with the district director of internal revenue, New Orleans, Louisiana. Dr. Bergeron, Dr. Braud, and Dr. Gregory will sometimes be referred to as the petitioners. In 1956, the legislature of the State of Louisiana established a Research and Training Account, funded by fees paid by or on behalf of certain *12 patients in State hospitals. All monies deposited in this account were dedicated without further or special appropriation to the State Department of Hospitals (the department) to be used, in part, for the training of psychiatrists and other professional personnel "to better qualify them for employment in state institutions and clinics for the mentally ill and mentally retarded and in hospitals owned and operated by the state." Sec. 4o:2113.1, Chapter 11, Title 40, Revised Statutes of Louisiana. Pursuant to such legislation, the department entered into a contract with Louisiana State University, School of medicine (the university), to establish and supervise a residency training program in psychiatry. Under the contract, the university was given exclusive authority to determine the nature of the instruction; to administer, conduct, and supervise the training program; to prepare the curriculum; to employ the required teaching personnel; to appoint all resident trainess; and to retain final authority over the trainees. At the same time, and pursuant to the same statutory authority, the department initiated a program of stipends to be granted to physicians in psychiatric residency programs. *13 The intended purpose of the stipend program was to alleviate the shortage of trained psychiatrists in the State hospital system. Such purpose was to be accomplished first by attracting residents to a psychiatric training program, then by training them in State facilities, and finally by contractually committing them to a period of service in department hospitals. During such service in department hospitals, the psychiatrists were to be paid at prevailing civil service rates, which were lower than those in private practice. The petitioners were all graduate physicians who had completed their internships and were recipients of department stipends. Each signed a similar contract which provided that the recipient was to be a psychiatric resident in the training program of the university and, upon completion of such program, was obligated to perform 2 years of professional services in the department's mental health program. In the event the 2-year obligation was not fulfilled, or the department cancelled the contract for cause, each petitioner agreed to repay, within 60 days, all amounts advanced to him as a stipend. Each contract provided that the: moving consideration * * * is the *14 oportunity afforded * * * [each recipient] to participate in the mental health training program of the State Department of Hospitals and the reciprocal benefits to be derived by the Department by virtue of such training program. Esch contract signed in 1966 went on to provide that: As a further consideration of this contract and the obligations assumed by * * * [each recipient] hereunder, the State Department of Hospitals will pay him an annual training stipend * * *. Similar provisions were included in earlier contracts signed by Dr. Braud and Dr. Gregory. Dr. Bergeron's contract, which was effective on September 1, 1966, provided for an annual stipend of $9,000 during the first year; $11,400 during the second year; and $12,000 during the third year. Dr. Braud's initial contract, which was effective on November 1, 1965, provided for 12 monthly installments of $834 during the first year; 12 monthly installments of $875 during the second year; and 12 monthly installments of $917 during the third year. Dr. Braud signed a revised contract effective July 1, 1966, which increased her annual stipend for the second year to $11,400, and for the third year, $12,000. Dr. Gregory's *15 initial contract, which was effective on July 1, 1965, provided for an annual stipend of $10,000 for the first year; $10,500 for the second year; and $11,000 for the third year. In June 1966, Dr. Gregory singed a revised contract, similar in all respects to the revised contract signed by Dr. Braud. The training program sponsored by the department was a joint activity of the university and the facility at which the resident was in attendance. A trainee was either a resident of the hospital or a fellow at the university. During his participation in the training program, Dr. Bergeron was enrolled as a resident in psychiatry, L.S.U. Division, at Charity Hospital in New Orleans. As a resident of the hospital, he received, in addition to the stipend from the department, the stipend granted to other residents, and on satisfactory completion of the training program, he received a certificate of proficiency from that hospital. During her participation in the training program, Dr. Braud was listed as a university fellow and assistant visiting physician at Charity Hospital. Her relationship to the hospital was the same as a resident; but the funds for her stipend were administered by the university, *16 and she received her certificate of proficiency from the university on satisfactory completion of the training program. Dr. Gregory was also listed as a university fellow during his participation in the training program. From the beginning of July 1965 through June of 1966, he was an assistant visiting physician at Central Louisiana State Hospital in Pineville (Central Hospital), but during the balance of his time in the program, he was transferred to Charity Hospital as an assistant visiting physician. The program for training psychiatric residents was divided into two phases. During the first phase lasting 1 year, the trainee was concerned with in-patient care, and that phase was spent at Charity Hospital or a State hospital. Dr. Bergeron and Dr. Braud each spent the year of in-patient care at Charity Hospital, and Dr. Gregory, at Central Hospital. During the in-patient phase of the program, a resident was assigned to a ward in the hospital where he was responsible for a certain number of patients. His responsibilities included the examination of the patient upon admission, the decision as to various types of diagnostic tests that might be necessary, the diagnosis, the treatment *17 plan, carrying out the treatment plan, and the final disposition of the patient. In addition, he was required to make progress reports on records of the medical history of his patients, to prepare a "Face Sheet" (which was a summary of the patient's condition at discharge), to ensure that at the time of discharge the patient's entire medical record was satisfactorily completed, to complete and execute a death notice in the event of a patient's demise, to take part in the morning report (which was a daily conference covering the events of the preceding evening), to be on call at all times, to be on duty from 7:00 a.m. to 5:00 p.m. for 5 or 6 days each week, and to be on duty every second or third night. The purpose of this training was to give the resident experience in treating patients requiring hospitalization. During this phase of the program, the resident was required to have consultations concerning his patients with a member of the university's faculty, who had responsibility for the proper care of patients, and who had actual contact with such patients. Charity Hospital was owned and operated by the State of Louisiana. Its primary objective was the treatment and care of eligible *18 citizens, particularly the sick and injured indigent. The budget of Charity Hospital was significantly less than that of other public hospitals of comparable size. As a result thereof, adequate financing was a constant administrative problem. Personnel salaries, although noncompetitive with the private sector, were nevertheless a substantial factor in the hospital's financing problems. Consequently, the residents and interns assumed a substantial portion of the burden of the regular care and treatment of patients. During 1966, the nonintern, nonresident physicians on the staff of Charity Hospital totaled 65, of which only 35 were fulltime staff members. Nearly all of the 35 physicians on the fulltime staff had administrative duties, including the 3 who comprised the staff of the Psychiatric Ward. In the fiscal year ending June 30, 1966, the Psychiatric Ward had approximately 130 in-patient beds, 2,184 in-patient admissions, 15,846 out-patient visits, 19 deaths, and 7 autopsies. Had the residents and interns been removed, the hospital would have been forced to lessen services or add other physicians. Central Hospital was a State mental hospital operated by the department. As of December 31, 1965, its *19 primary purpose was in-patient care. During the fiscal year ending in 1965, the bed capacity of Central Hospital was 3,200, the admissions totaled 3,142, and the average daily population was 2,726. In the second phase of the program for training psychiatric residents, the trainee worked with outpatients. During that phase, Dr. Bergeron continued to be enrolled as a resident at Charity Hospital, and Dr. Braud and Dr. Gregory each continued to be enrolled as an assistant visiting physician at that hospital; nevertheless, they spent most of their time at the Community Mental Health Center (the clinic) on Florida Avenue in New Orleans. The only time they spent at Charity Hospital was during the Wednesday morning out-patient clinic. The clinic was operated by the university and was not connected with Charity Hospital. The purpose of this phase of the training was to broaden the range of patients available to the resident beyond that at Charity Hospital. In 1966, the out-patients treated at the clinic were referred by private psychiatrists and by other clinics, agencies, and institutions. At that time, the clinic did not hold itself out to care for all patients needing treatment; rather, *20 a patient was admitted on the basis of whether the treatment of his mental disorder would further the training of the residents, and patients were assigned to residents on a similar basis. As a general rule, the patients at the clinic were of an economic strata superior to that of the indigents served by Charity Hospital. Thus, work in the clinic gave the resident an opportunity to see the middle class and the moderately and well educated. These were patients financially capable of undertaking psychotherapy over a long period and were the type of patients generally encountered in practice. During the second phase of the training, there was very little direct supervision over the trainee. Generally, the supervision took the form of discussions and interviews with members of the clinical faculty, who were practicing physicians, and who had little or no actual contact with the patients. However, the work of the trainee was regularly evaluated by the staff of the university. Throughout both phases of the program, the participants were required to attend classroom lectures and seminars. Such didactic instruction was also necessary to prepare the participants in the training program *21 to become members of the American Board of Psychiatry and Neurology, Inc. (the board). The board is a professional society of psychiatrists, and to become a member of it, an applicant must take and pass an examination. To be eligible to take the examination, the applicant must have satisfactorily completed a training program in psychiatry and must have completed 2 years of practice subsequent to such training. Thus, participation in the training program did enable each of the petitioners to fulfill one of such requirements, although at the time of trial of this case, none of the petitioners had yet become a member of the board. The participation in the training program also made them more proficient in the practice of psychiatry. However, since each of the petitioners was a qualified physician, he was licensed to practice medicine, including the practice of psychiatry. Upon completion of the training program, both Dr. Bergeron and Dr. Braud fulfilled their contractual commitments by serving as psychiatrists in the department's mental health program for 2 years. Dr. Gregory, who served in such program for slightly less than 2 years, substantially fulfilled his commitment. During *22 1966, Dr. Bergeron also received a grant of $1,800.00 from the National Institute of Mental Health (NIMH). In that year, Dr. Braud also received a similar grant in the amount of $4,369.88. The respondent concedes, for the purposes of this case, that such grants are subject to the exclusion under section 117(a). In his notices of deficiency, the respondent determined that no part of the stipends received by the petitioners from the department qualified for exclusion under section 117(a). Also, in his deficiency notice to Dr. Braud, the respondent determined that she was not a candidate for a degree, and therefore, the exclusion allowed for the NIMH grant was limited by section 117(b)(2)(B). OPINION Two issues are presented for decision: (1) Whether the stipends received by the petitioners from the department qualify for exclusion under section 117(a), and (2) whether the petitioners were candidates for degrees, within the meaning of section 117(b), during their participation in the psychiatric training program. Section 117(a) provides for the exclusion of a scholarship or fellowship grant. The statute does not contain any definition of such terms, but section 1.117-4, Income *23 Tax Regulations, provides in part: The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * (c) * * * (1) * * * any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. * * * However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. * * * Such regulations were approved by the Supreme Court in Bingler v. Johnson, 394 U.S. 741, 751 (1969), the Court saying: *24 Here, the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quid pro quo from the recipients. See also Ussery v. United States, 296 F. 2d 582 (C.A. 5, 1961). "There is nothing in the legislative history to indicate that the statute was designed to exclude from gross income all payments made to enable individuals to participate in a program of educational value." Ussery v. United States, supra at 586. In the case before us, the petitioners were participants in a program designed to alleviate the shortage of psychiatrists in the State of Louisiana and to train psychiatrists for work at the State hospitals. Each received a relatively large stipend from the department, and each was obligated to perform future services. The record indicates that the stipend was set at a high enough level so as to attract competent participants to the program. Dr. Bergeron and Dr. Braud completed their 2-year obligation, and Dr. Gregory substantially completed it. *25 During the period of obligatory service, each was paid at the prevailing civil service rate which was lower than the rate for psychiatrists in private practice. In the circumstances of this case, the petitioners were required to perform substantial future services in return for receiving the stipends. In view of that obligation, it is clear that the stipends were not granted to them with "no-strings" or that the stipends were "disinterested" educational grants. Bingler v. Johnson, supra at 394 U.S. 751. The performance of such future services was the "quid" given by the petitioners for the stipends. The performance of any substantial services in return for the stipend indicates that the payment was compensatory, and not an excludable fellowship grant. Hembree v. United States, 464 F. 2d 1262 (C.A. 4, 1972); Ussery v. United States, supra.The facts of this case are not distinguishable from Leonard T. Fielding, 57 T.C. 761 (1972), in which we held that a stipend received by a resident was taxable compensation because he was required to perform 2 years of service for the State after the completion of the residency. *26 we expressly indicated that the grant was taxable even though no present or prior services were rendered by the recipient. See also Lowell D. Ward, 55 T.C. 308 (1970), affd. per curiam 449 F. 2d 766 (C.A. 8, 1971). Accordingly, we hold that the stipends received from the department were not excludable under section 117(a). The remaining issue to be decided is whether Dr. Braud, as a participant in the psychiatric training program in 1966, was a candidate for a degree at an educational institution. Section 117(b) governs the extent to which a payment, qualifying as a scholarship or fellowship grant under section 117(a), is excludable from income. If the recipient is a candidate for a degree from an educational institution, the entire amount of the grant is excludable. However, if the recipient is not a candidate for a degree at an educational institution, the exclusion allowable in any taxable year is limited to $300 times the number of months for which amounts were received as a scholarship or fellowship grant during such year. Sec. 117(b)(2)(B). Although Dr. Bergeron received a grant from NIMH in 1966, it is agreed that the entire amount of such grant *27 is excludable because the respondent concedes that it qualified as a fellowship grant under section 117(a) and because it did not exceed the limit set by section 117(b)(2)(B). On the other hand, because the NIME grant received by Dr. Braud in 1966 exceeded the maximum amount excludable by a person who is not a candidate for a degree, the excludability of the excess depends upon whether she was a candidate for a degree within the meaning of section 117(b). Although the term "degree" is not defined in section 117 or in the regulations thereunder, the recipient of a post-doctoral fellowship is explicitly excluded from the term "candidate for a degree" by the regulations. Section 1.117-2(b)(3) Examples (1) and (2), Income Tax Regs. This regulation is supported by the committee report accompanying the enactment of section 117. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 189-190 (1954). We see no difference between a post-doctoral fellowship and the NIMH grant awarded Dr. Braud. In both instances, the recipients were previously awarded degrees of equal stature and are seeking to become proficient in a specialized area. The mere fact that Dr. Braud eventually received a certificate is of *28 no consequence. See Hembree v. United States, supra at 464 F. 2d 1263 fn. 3; Woddail v. Commissioner, 321 F. 2d 721, 722 (C.A. 10, 1963), affg. a Memorandum Opinion of this Court; Frederick Fisher, 56 T.C. 1201, 1206 (1971); Aloysius J. Proskey, 51 T.C. 918, 921 (1969); Ethel M. Bonn, 34 T.C. 64, 69 (1960); Wertzberger v. United States, 315 F. Supp. 34, 35 (W.D. Mo. 1970), affd. per curiam 441 F. 2d 1166 (C.A. 8, 1971); Wrobleski v. Bingler, 161 F. Supp. 901, 903 (W.D. pa. 1958); in such cases, this and other courts have consistently found as fact that resident physicians in similar programs are not candidates for a degree within the meaning of section 117(b). Thus, we hold that Dr. Braud was not a candidate for a degree when she received the NIME grant in 1966. In their briefs, the parties have argued whether the stipends received from the department represented compensation because of the services performed by the petitioners while they participated in the psychiatric training program. However, we see no purpose in discussing such issue because of our holding that, *29 in any event, the stipends represented compensation for the services to be rendered after the completion of the training program. Dr. Bergeron and Dr. Braud argued at trial and in their briefs that the respondent, by allowing the NIMH grants to qualify for the exclusion of section 117(a), has tacitly admitted that the restrictive provisions of section 1.117-4(c), Income Tax Regulations, do not apply to any of the stipends received by them; they urge that this tacit admission be applied to the department stipend as well. We disagree. The petitioners have offered no reasons in support of this statement. The record indicates that the NIMH grant was separate and distinct from the department grant. The NIMH grant contained no provision requiring the recipient to perform future services. Thus, there is no ground for treating the respondent's concession with respect to the NIMH grant as an admission with respect to the stipend from the department. Finally, in his petition, Dr. Bergeron challenged the respondent's determination that he was entitled to a standard deduction of only $700.01. The deduction allowed by the respondent was proper based on $7,000.12 of gross income received by *30 Dr. Bergeron in 1966. In the absence of both a list of itemized deductions, and proof of such deductions, we hold the respondent was correct in allowing a standard deduction of such amount. Similarly, Dr. Braud challenged an addition to income of $328.67, representing a disallowance of medical expenses equal to 3 percent of her adjusted gross income, as determined by the respondent. Because we have held that Dr. Braud received the additional income in 1966, the respondent was correct in his adjustment with respect to medical expenses. Decisions will be entered For the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Elodie B. Pons Braud, formerly Elodie B. Pons, docket No. 3403-69; Walter D. and Margaret E. Gregory, docket No. 3623-71.↩
2. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩