*Decision will be entered under Rule 50.*

LEONARD T. FIELDING AND LOIS C. FIELDING, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2557-69. Filed March 13, 1972.

*Edward M. Cohen*, for the petitioners.
*Richard J. Hunter*, for the respondent.

IRWIN, *Judge:* Respondent determined the following deficiencies in the income taxes of petitioners:

| Year | Deficiency |
|------|-----------|
| 1963 | $455.40 |
| 1964 | 1,693.31 |
| 1965 | 1,572.54 |

The deficiencies stem from respondent's inclusion in gross income of amounts that petitioners excluded as a fellowship under section 117, and from respondent's disallowance of deductions for tuition expense and his recomputation of petitioners' medical expense deductions.

FINDINGS OF FACT

Some of the facts have been stipulated and they are found accordingly.

Leonard T. Fielding and Lois C. Fielding are husband and wife, who at the time of filing their petition maintained their legal residence in Minneapolis, Minn. They filed joint Federal income tax returns for the years 1963, 1964, and 1965 with the district director of internal revenue, St. Paul, Minn.

Lois C. Fielding is a party to this action solely by reason of her having filed a joint Federal income tax return with Leonard T. Fielding for each of the taxable years 1963, 1964, and 1965. Leonard T. Fielding will be hereinafter referred to as the petitioner.

Petitioner received his bachelor of science degree in 1958 from the University of Minnesota and his doctor of medicine degree from the University of Minnesota Medical School in 1962. Following the completion of medical school in 1962, petitioner applied for and was accepted as an intern at the Hennepin County General Hospital, Minneapolis, Minn. Petitioner's internship terminated in June 1963.

At all times material herein the Department of Public Welfare for the State of Minnesota, hereinafter called Department, had an established professional training program known as the Psychiatric Residency Training Program, which it maintained for the purpose of alleviating the scarcity of applicants for the positions as psychiatrists in State mental hospitals.

On or about May 20, 1963, petitioner applied to Department seeking admission to Department's residency program. On May 23, 1963, petitioner entered into an agreement with Department, part of the terms of which were the following:

WHEREAS, the Department desires to have LEONARD T. FIELDING, M.D., educated and trained as a psychiatrist to fill a position as a psychiatrist in the State Mental Hospitals when such education and training is completed;

Now, THEREFORE, IT IS HEREBY AGREED by and between the parties as follows:

1. The psychiatric resident hereby applies to the Department for an educational allowance to be used in training as a psychiatrist and agrees to enter an accredited training program with inpatients and outpatients at the University of

Minnesota, Minneapolis, Minnesota, commencing July 1, 1963, pursuing such courses, training and education as is directed by the Department for a period of three (3) years, hereinafter referred to as the first, the second, and the third years. The psychiatric resident further agrees that at some time after the conclusion of such education and training, he will accept a position as a psychiatrist with the State of Minnesota in a State Hospital or in some other professional capacity for which he has been trained, as determined by the Department, for a period of not less than two (2) years.

2. The Department hereby grants to the psychiatric resident the sum of Eight Thousand Dollars ($8,000) for the first year, Eight Thousand Five Hundred Dollars ($8,500) for the second year, and Nine Thousand Dollars ($9,000) for the third year, payable in monthly installments.

3. The Department reserves the right to cancel this Agreement at any time if it appears the program and training of the psychiatric resident is not satisfactory.

4. Failure of the psychiatric resident to satisfactorily make progress in his training as determined by the Department or his failure to complete the five (5) year program as herein provided shall constitute a breach of this Agreement.

5. In the event of any breach of this Agreement, the psychiatric resident agrees to refund to the Department all moneys received by him as an education allowance under this Agreement.

Pursuant to the terms of the agreement, in July 1963 petitioner enrolled at the University of Minnesota Medical School, Department of Psychiatry and Neurology, as a degree candidate for the academic degree of master of science in psychiatry.

While a resident in Department's psychiatric residency training program, petitioner was paid an educational allowance for each of the taxable years 1963, 1964, and 1965 by Department in the amounts of $4,000.02, $8,000, and $8,500, respectively. The educational allowances bore no relationship whatsoever to the need or marital status of petitioner at any material time and the allowance was not peculiar to petitioner. At no time did Department deduct or withhold income taxes, social security taxes, or State employees' retirement funds from the allowances paid to petitioner while enrolled in the psychiatric residency training program, nor did petitioner accrue vacation or sick leave, participate in the employee group health and life insurance plan or any other programs for which employees of Department were eligible during the period of residency.

Throughout his residency petitioner made no reports at all to Department. Petitioner had no visits and no direct or indirect supervision from Department for the same period although under the agreement Department had the right to exercise such supervision.

Petitioner was not an employee of Department prior to the execution of the agreement, nor did he become an employee of Department during his residency training program which ended on June 30, 1966. On July 1, 1966, petitioner was employed by Department as a senior staff physician at the Anoka State Hospital and remained there

through December 29, 1966. On January 9, 1967, Department employed petitioner as the senior staff physician at the Willmar State Hospital. Petitioner remained at Willmar State Hospital through May 5, 1967, when he resigned and moved to the State of Delaware, where he was employed by the State of Delaware as a senior staff physician until June 1, 1968, when he returned to the State of Minnesota.

The State of Minnesota has taken no legal action, nor has the State of Minnesota attempted to legally enforce the provisions of the agreement with regard to the reimbursement of any funds received by petitioner in the event of a breach of the agreement. A majority of the students who had participated in the psychiatric residency program fulfilled their obligation of 2 years of work for the State after completion of the residency, and the State had never taken any legal action against any student who breached his agreement.

Upon his return to Minnesota in June 1968, petitioner began to engage in the private practice of psychiatry; however, he did perform work for the State as a consultant for various institutions. Petitioner was paid on a daily or hourly basis under contracts with the State for each institution. The director of personnel for Department indicated that Department considered the consulting work performed by petitioner to be in partial fulfillment of his obligation to the State. In all instances petitioner was paid the same amount of wages or fees for his services to the State that would have been paid to any other doctor with the same training and experience who had not received educational allowances from the State.

OPINION

This case is yet another involving a physician who has excluded grants received during his residency as a scholarship under section 117 of the Internal Revenue Code of 1954 and has been challenged by respondent. This case differs both from other section 117 cases that we have found in that petitioner performed no services for the grantor prior to receiving his purported fellowship and from other cases involving resident physicians in that petitioner performed no services for the grantor while receiving the purported fellowship. *Bingler* v. *Johnson*, 394 U.S. 741 (1969); *Ussery* v. *United States*, 296 F. 2d 582 (C.A. 5, 1961); and *Aloysius J. Proskey*, 51 T.C. 918 (1969). The only string attached to the grants in addition to enrollment in an accredited program was that petitioner had to work for the grantor for 2 years at some time after completing his residency. For this work he was to be paid the same salary that any other doctor with similar training would receive for performing similar services for the State.

Despite these differences, we believe that respondent properly in-

cluded the fellowship grants in petitioner's income for the years in issue.

With limitations in the case of nondegree students section 117 permits an individual to exclude from gross income any amount received as a scholarship or fellowship. The terms scholarship and fellowship are not defined by the statute; however, section 1.117–4, Income Tax Regs., defines them in a negative manner:

Sec. 1.117–4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\*        \*        \*        \*        \*        \*        \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. \* \* \*

Any doubt concerning the propriety of the definitions contained in the regulation was eliminated by the Supreme Court in *Bingler* v. *Johnson, supra,* which stated:

Here, the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial *quid pro quo* from the recipients. [394 U.S. at 751.]

Upon the record in this case we believe that the State granted petitioner the educational allowance in consideration of his promise of 2 years' future work for the State. Petitioner has not argued that his agreement with the State was not enforceable, nor do we think it material that the State failed to take legal action against him when he breached his agreement. We believe that petitioner owed an enforceable obligation to the State which constituted a sufficient string upon the grants under the regulation and *Bingler* v. *Johnson, supra,* to disqualify them for exclusion under section 117.

Notwithstanding the regulation and *Bingler* v. *Johnson,* petitioner contends that our decision in *Aileene Evans,* 34 T.C. 720 (1960), controls in this case. In *Lowell D. Ward,* 55 T.C. 308 (1970), affd. 449

F. 2d 766 (C.A. 8, 1971), this Court held that we would no longer follow *Aileene Evans, supra.* See also *Robert W. Willie,* 57 T.C. 383 (1971). Even if *Evans* remained sound precedent, our former case can be distinguished from the present one. The petitioner in *Evans* was a registered nurse who accepted a grant from the State of Tennessee which enabled her to enroll in a psychiatric nursing program. The petitioner agreed to work for the State for a certain time after completing her course of study. Though these facts appear to resemble those of the present controversy, *Evans* can be distinguished because the amount of the grant that the petitioner there received was determined solely by her financial needs. That fact led us to find on the record that the primary purpose of the grant was to further petitioner's education and that the promise of future services was only an incidental benefit to the State. *Aileene Evans, supra* at 726. In this case the amount of the grant bore no relation to petitioner's financial needs and was set at a figure that Department felt would attract students into the program. The primary purpose of the Minnesota program was to recruit new psychiatrists; the grants to petitioner were primarily for the benefit of the grantor.

Accordingly, we hold that petitioner may not exclude any part of the educational allowances received from Department during the years in issue as a scholarship under section 117.

In addition to excluding the amounts received from the State, petitioner also deducted as a business expense his payments for tuition during the years in issue. He now argues for these deductions only as an alternative to the scholarship exclusion. Petitioner contends that, if the educational grants are considered to be compensation for future employment paid by Department, his training in psychiatry was a requirement of this employment.

First, in denying petitioner the benefits of section 117, we have not held that he was an employee of Department, but we have found that the educational allowances simply did not constitute a scholarship. Second, even if the allowances were compensation, we can find no moral or legal reason for giving petitioner tax benefits not enjoyed by other students in professional training who work to defray the cost of their education.

After finishing his internship petitioner did not engage in a profession but could have engaged in the general practice of medicine without further education or training. He did not undertake his residency to improve his skill as a general practitioner but to attain a new profession. Compare *John S. Watson,* 31 T.C. 1014 (1959). Petitioner's tuition expenses were clearly not an incident of any profession that he practiced and are not deductible under section 162. See sec. 1.162–5, Income Tax Regs. (1958), and sec. 1.162–5, Income Tax Regs. (1967).

Our disallowance of petitioner's exclusions under section 117 and deductions under section 162 will require the adjustments to petitioner's medical expense deduction set forth in the statutory notice.

*Decision will be entered for the respondent.*