Lawrence A. EHRHART et al.,
Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent, Appellee.

Thomas P. TIERNEY et al., Petitioners,
Appellants,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent, Appellee.

Nos. 72–1258, 72–1259.

United States Court of Appeals,
First Circuit.

Argued Oct. 3, 1972.

Decided Jan. 2, 1973.

Thomas P. Tierney, pro se.

Lawrence A. Ehrhart, pro se.

Carolyn R. Just, Atty., Tax Div., Dept.
of Justice, with whom Scott P. Cramp-

ton, Asst. Atty. Gen. Meyer Rothwacks, and Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

CAMPBELL, Circuit Judge.

Lawrence A. and Melanie D. Ehrhart, and Thomas P. and Joann M. Tierney appeal from the Tax Court's decision, 57 T.C. 872, upholding the Commissioner's determination of deficiencies for the years 1966, 1967 and 1968.[1] The Tax Court decided that "living allowances" paid by insurance companies to their actuarial employees attending Northeastern University Graduate School of Actuarial Science were paid primarily for the benefit of the insurance companies and do not constitute scholarships or fellowships excludable from the gross income of recipients under Section 117(a)(1), I.R.C.1954. We affirm.

According to Section 117, any amount received as a scholarship or fellowship grant is non-taxable. Treasury Regulation § 1.117–3 defines "scholarship" as "an amount paid or allowed to . . . a student . . . to aid such individual in pursuing his studies. . . . The term also includes any amount received in the nature of a family allowance as a part of a scholarship." How-

ever, Regulation § 1.117–4(c)(2), recently upheld by the Supreme Court in Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969), specifies that "Any amount paid or allowed to . . . to an individual to pursue his studies or research primarily for the benefit of the grantor" is *not* a scholarship or fellowship grant.[2]

As the Tax Court itself has previously concluded, we think correctly, whether or not an amount was paid primarily for the benefit of the grantor is largely a question of fact. *See* Robert W. Willie, 57 T.C. 383 (1971). We do not overturn a finding of fact made by the Tax Court unless convinced that its finding was "clearly erroneous." Commissioner v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Crepeau v. Commissioner, 438 F.2d 1228 (1 Cir. 1971); Young Motor Co. v. Commissioner, 339 F.2d 481, 483 (1 Cir. 1964). Here, both the Tax Court's ultimate and its subsidiary findings were amply supported in the record.

The facts most relevant to the appellants' claim may be summarized as follows:

Appellants Ehrhart and Tierney were employed by New England Mutual Life Insurance Company and John Hancock Mutual Life Insurance Company, respectively, as actuaries. Actuaries are highly skilled mathematicians who function as technical experts of life insurance companies, calculating premium rates

| 1. | Year | Petitioners Ehrhart | Petitioners Tierney |
|----|------|---------------------|---------------------|
|    | 1966 | $114.75             | $                   |
|    | 1967 | 377.96              | 344.03              |
|    | 1968 | 268.75              | 222.88              |

This case arises out of the activities of the husbands alone. Mrs. Ehrhart and Mrs. Tierney are parties to the appeals solely because they filed joint income tax returns with their husbands for the taxable years in issue.

2. On the other hand, "if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity," the Regulation provides that an amount paid therefor is a scholarship or fellowship grant. The word "purpose" as used here, and as implied in § 1.117–4(c)(2), attaches, we think, to the grantor, i. e. it is the primary purpose imputed to the grantor which controls.

and analyzing various contingencies affecting human life. To become recognized as a fully qualified actuary, one must pass a series of ten examinations administered by an organization known as the Society of Actuaries.

In 1964, an acute shortage of qualified actuaries prompted some 40 life insurance companies, institutions and agencies (hereinafter "companies") to assist Northeastern University in establishing a Graduate School of Actuarial Science. The companies contributed substantial supporting grants to the school during its formative years, and have always paid the tuition of their students. Some companies, including New England Life and John Hancock granted their students "living allowances" to cover expenses during the time they attended school.

The School would only accept as students those who were employees of the "sponsoring" companies.[3] The curriculum was devoted exclusively to preparing students to pass levels three through six of the examinations administered by the Society of Actuaries. During the two-year program, the students were required to attend Northeastern for ten weeks, and then work for the company for 16 weeks, seriatim. While they attended school, they performed no services for their sponsors. If a student's employment relationship with his sponsor were terminated for any reason, he was not permitted to complete his studies at Northeastern.

The Tax Court found that, in helping to establish the School, the insurance companies were motivated by a desire to increase the available pool of actuarial talent. Sponsorship of the students carried with it many benefits. These included attracting employees from other regions of the country, in the manner Ehrhart was attracted to New England Life, employing actuaries who were becoming more and more skilled as they passed successive examination levels, and an opportunity for the companies to present themselves to the students as attractive permanent employers.

The Tax Court concluded that:

As we view the entire record, the Northeastern program represented a recruitment and training tool of its collective sponsors . . . its enrollment requirements were designed to channel students into the eventual employ of their particular sponsors . . . Thus, the practical advantage of sponsorship to an insurance company was the opportunity to develop a close enough association between itself and its students during the work periods that the latter would be induced to remain after graduation as well-trained, permanent employees . . . petitioners' respective sponsors regarded them as full-time employees who were simply on school leave . . . Considered in the context of the entire sponsorship program, the living allowances paid to the petitioners constituted personnel investments by their respective employers. They hardly represented such disinterested "no-strings" payments as the regulations contemplate,

---

3. Tierney had been employed by John Hancock for a year and a half, first as a computer programmer and then as an actuarial trainee, prior to his entering the Northeastern Program. Ehrhart received a letter from Northeastern describing the Program while he was a senior at the University of North Carolina. He subsequently was interviewed by Dean Geoffrey Crofts who, after informing him that he would have to find a sponsor, referred him to New England Life. After his graduation from college in the spring of 1966, Ehrhart began working in the actuarial training program at New England Life, and enrolled at Northeastern in the fall of 1966. Thus, it was possible for one to become an employee at the same time one was accepted as a student. However, Dean Crofts testified that, "Most of the students come because they were contacted by the companies, employed and referred to us."

but rather were made to induce petitioners' performance of services for the benefit of their respective grantors.

The recent decision of the Supreme Court in Bingler v. Johnson, *supra,* sets forth guidelines for interpreting Treasury Regulation § 1.117–4(c). *Bingler* involved engineers employed by Westinghouse who participated in Westinghouse's Fellowship and Doctoral Program. The Program was divided into two phases. During phase 1, the employee attended school eight hours a week, but continued working for Westinghouse, receiving full salary and tuition. During phase 2, the employee was granted a leave of absence to devote his time to writing a dissertation. He received a stipend of from 70–90% of his regular salary, plus "adders" based upon the size of his family. He retained his seniority at Westinghouse, all employee benefits, and had to sign an agreement to return to the company for two years after receiving his doctorate.

The Court held that the amounts received by the employees were taxable "compensation" rather than excludable "scholarships:"

The employer-employee relationship involved is immediately suggestive, of course, as is the close relation between the respondents' prior salaries and the amount of their "stipends." In addition, employee benefits were continued. Topics were required to relate at least generally to the work of the Bettis Laboratory. Periodic work reports were to be submitted. And, most importantly, Westinghouse unquestionably extracted a *quid pro quo*. The respondents not only were required to hold positions with Westinghouse throughout the "work-study" phase of the program, but also were obligated to return to Westinghouse's

employ for a substantial period of time after completion of their leave. The thrust of the provision dealing with compensation is that bargained-for payments, given only as a *"quo"*. in return for the *"quid"* of services rendered—whether past, present, or future—should not be excludable from income as "scholarship" funds. (394 U.S. pp. 756–758, 89 S.Ct. p. 1448).

Here, as in *Bingler*, the study program is inextricably related to employment. Northeastern would only maintain as students those who were in the employ of a sponsoring life insurance company. Employee benefits were generally continued throughout the school term;[4] and the curriculum was directly tied to developing a skill of unique value to the companies.

On the issue of *quid pro quo*, it is true that after (though not before) the student completed his studies, he was no longer bound to the employer. The evidence indicated that many employees did not, in fact, remain, although the two appellants chose to do so.[5] However, the Tax Court could infer that the companies' primary object in financing the program was their hope that students would remain as employees. Hearts can be won as well as coerced. Moreover, because many companies were participating, a company might reasonably expect that if a particular ex-student left its employ, those sponsored by other companies would become available.

▮ There was evidence that actuaries are both needed and scarce. On all the facts, we cannot say that the Tax Court was clearly erroneous to conclude that the sponsoring companies hoped, by means of the program, to attract and retain skilled actuaries and that this hope "plainly constituted the heart of their sponsorship objectives." Nor was it plainly wrong in finding that the compa-

---

4. The relation between salaries and living allowances was not as close as in *Bingler.*

5. At the time of trial, approximately three and one-half years after receiving their master's degrees, both appellants were still employed by their former "sponsors."

nies were not motivated by "disinterested considerations." This being so, we, like the Tax Court in John E. MacDonald, Jr., 52 T.C. 386, 393 (1969), see "no indispensable requirement that there be a contractual undertaking." Whether one speaks of hopes or legal obligations, the ultimate question is whether under all the circumstances, the object of the allowance was, from the employer's standpoint, primarily for its own benefit. *See* Mueller v. Commissioner, 338 F.2d 1015 (1 Cir. 1964).

■ Nor does it detract from the Tax Court's conclusion that, from the employee's standpoint, the program offered substantial benefits to him. We do not read the Regulation as a "zero sum game", where benefit to the employer means loss to the employee. *See* Robert W. Willie, 57 T.C. 383, 389 (1971). Aloysius J. Proskey, 51 T.C. 918 (1969). The question is whether the employer's objective was primarily its own benefit—not whether the employer's actual gain exceeded or outweighed the employee's.

Business corporations, of course, can perform eleemosynary acts. An insurance company might sponsor a liberal arts scholarship for disabled young persons, or a community program to train hospital orderlies. Here, however, we deal with a living allowance to help enable an employee to improve his skills in a field vital to the company's operations. Sound and admirable as the program is, we are unpersuaded that the Tax Court was plainly erroneous in concluding that the amounts expended were, from the grantor's standpoint, primarily expended for its own long and short-term benefit.[6]

Affirmed.

6. We also reject appellant's argument that the payments are excludable under Section 117(b)(1), I.R.C.1954 and Treasury Regulation § 1.117(a)(2). As the Tax Court found, the provisions of Section 117(b)(1) are inapplicable absent a determination, not appropriate here, that the payment sought to be excluded is a "scholarship" or "fellowship" under Section 117(a). Elmer L. Reese, Jr., 45 T.C. 407, 413–415 (1966).