GEORGE L. BAILEY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 643–72. Filed June 18, 1973.

*L. Joyce Hampers,* for the petitioner.
*Willard J. Frank,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $783.85 in the petitioner's Federal income tax for the year 1967. The sole issue for decision is whether a training stipend received by the petitioner is a fellowship grant under section 117(a) of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, George L. Bailey, was a resident of Brookline, Mass., at the time his petition was filed in this case. He filed his Federal income tax return for the year 1967 with the district director of internal revenue, Boston, Mass.

The petitioner is a medical doctor and in 1966 completed his residency in internal medicine. During the last year of such residency, the petitioner decided to narrow his medical specialty to nephrology and renal disease. The petitioner applied to, and was accepted in, the cardiorenal training program at Peter Bent Brigham Hospital (the hospital). There, he hoped to learn both the procedures of hemodialysis and the laboratory disciplines involved in transplantation, immunology, and renal disease in general, and to secure additional training in research techniques and the basic sciences. In addition to his acceptance in the program, the petitioner was appointed a research fellow at Harvard Medical School. Such appointment enabled the petitioner to do research and experiment with human beings.

---

[1] All statutory references are to the Internal Revenue Code of 1954.

The hospital is affiliated with Harvard Medical School and is an organization described in section 501(c)(3) which is exempt from tax under section 501(a). Its three main functions are patient care, teaching, and research. The senior staff members of the cardiorenal section, headed by Dr. John P. Merrill, were recognized as the foremost authorities in nephrology.

The cardiorenal training program was funded in large measure through a training grant (the NIH grant) awarded by the National Institutes of Health, which is part of the Public Health Service of the Department of Health, Education, and Welfare, and which is an instrumentality of the United States. In accordance with the general policy of the Public Health Service, the NIH grant was awarded to assist the hospital in establishing and improving training opportunities for individuals interested in careers in research, teaching, administration, and services in the health sciences. The specific object of the cardiorenal program at the hospital was to train graduates in the general area of tissue transplantation, with particular reference to kidney allografting. The funds received by the hospital under the NIH grant were used to obtain equipment, to pay salaries of hospital personnel, such as instructors, technicians, and secretaries, and for trainee stipends. With respect to such stipends, the hospital was free to select persons whom it deemed best fit into the training program, subject to the final approval of NIH. However, not all the trainees in the program received financial support from NIH. In 1967, of the trainees who participated in the program, four received support from outside sources, while only the petitioner and one other doctor received support from funds allocated in the NIH grant.

The petitioner entered the program in July 1966. During the first 6 months of 1967, his training took place in the hospital, where he accompanied Dr. Merrill and Dr. Constantine Hampers, the head of the hemodialysis program, on their daily patient rounds. As a part of such activity, he transcribed the observations and recommendations of the senior staff onto the charts of the patients, so that the residents and interns, who were primarily responsible for the daily care of such patients, would be apprised of the instructions of the senior staff. Although it would have been more efficient for the senior staff to transcribe their observations and recommendations themselves, the petitioner was asked to do so to develop his facility to observe, diagnose, prescribe treatment, and communicate with those actually caring for patients undergoing hemodialysis or transplantations. As his training progressed, the petitioner made suggestions to the senior staff on the status and treatment of their patients; however, throughout this phase of the training program, the notes transcribed reflected the decisions of the senior staff and were made only at their direction. Dialysis,

observation, and treatment notes written by the petitioner appear on the charts of 22 of the 33 patients admitted to the hospital for kidney transplants in 1967.

During his training in the hospital, the petitioner also learned the procedure involved in hemodialysis, attended conferences, and assisted Dr. Hampers when he established a home dialysis program for the three or four patients undergoing such treatment. However, aside from the daily rounds made with and under the supervision of the senior staff, the petitioner neither saw nor treated patients, was never on call, and had no routine duties. Although medical students accompanied the petitioner and the senior staff on their daily rounds, and thereby received practical instruction in hemodialysis and transplantation, the petitioner conducted no formal classes for medical students in 1967.

From the middle of July 1967 through the end of that year, the petitioner, with the permission of Dr. Merrill, spent all his time in training in laboratory techniques and research at the Harvard Tissue Immunology Laboratory (the laboratory). The laboratory was affiliated with Harvard Medical School, but was not affiliated with the hospital—it was located in a different part of the greater Boston area and was funded by a grant from the U.S. Army. Under the guidance of Dr. Edward Hager, the director of the laboratory, and Dr. Hampers, the assistant director, the petitioner studied transplant immunology with mouse tumors and also performed some research. Although the results of such research were published by the petitioner, he was not expected to aid in the research project of the laboratory, was not required to keep regular hours while assigned there, and received no part of his stipend from the grant supporting the laboratory's research. In 1967, three technicians and a secretary were employed at the laboratory, in addition to Dr. Hager and Dr. Hampers, and no trainee in the hospital's cardiorenal program, other than the petitioner, was assigned there during such year.

With respect to the stipend received by the petitioner in 1967, the general policy of the Public Health Service was that a postdoctoral trainee with no relevant postdoctoral experience received $6,000 a year, a trainee with 1 year of such experience received $6,500, and a trainee with 2 years of such experience received $7,000. A trainee with 3 or more years of relevant postdoctoral experience could be designated as a "special trainee," in which case, he could receive a stipend in excess of $7,000 resulting from negotiations with the Public Health Service awarding unit or based upon a specific guideline of such unit. An additional $500 dependency allowance was provided for each dependent spouse and child of a trainee and for each dependent relative who received more than half of his support from the trainee.

For the period July 1, 1966, through June 30, 1967, the petitioner

received a stipend of $6,500, plus a dependency allowance of $500 for the support of his mother. He also contributed to the support of a teenage sister. Because of continuing financial difficulty, the petitioner requested of Dr. Merrill that his stipend be increased during the second year. Such request was made in early September. In a letter to NIH dated September 8, 1967, Dr. Merrill requested that the petitioner be designated a "special trainee," as he had 5 years of relevant postdoctoral experience. Accordingly, for the period July 1, 1967, through June 30, 1968, the petitioner received a stipend of $9,000.

In paying the stipend to the petitioner, the hospital withheld FICA and Federal income taxes on amounts in excess of $300 per month during the year 1967. It subsequently determined that no part of the stipend was subject to FICA payments and, therefore, filed a statement to correct previous information, after which the FICA payments were automatically abated. The hospital, in paying interns, residents, and research fellows in programs funded by research grants and contracts, withheld FICA and Federal income taxes on all amounts paid. The petitioner did not participate in any life insurance plan offered through the hospital, and did not receive fringe benefits normally offered hospital employees, although he took a vacation and had premiums for hospitalization insurance deducted from his stipend payments.

Upon completion of his training, the petitioner turned down offers from two other hospitals and accepted an appointment at Harvard Medical School and an accompanying position on the staff of the cardiorenal section of the hospital. He was under no contractual obligation to accept such positions. The petitioner eventually replaced Dr. Hampers as the director of home dialysis at the hospital when the number of patients under such treatment warranted a full-time director.

On his Federal income tax return for the year 1967, the petitioner excluded $3,500 of the stipend he received under the NIH grant, and in his notice of deficiency, the respondent determined that no portion of such stipend was an excludable scholarship or fellowship grant under the provisions of section 117.

OPINION

Section 117(a) excludes from gross income amounts received as a scholarship or fellowship grant. In the case of a taxpayer who is not a candidate for a degree, section 117(b)(2) sets forth additional conditions and limitations with respect to the exclusion. Such conditions and limitations have been met in this case since the hospital is an organization described in section 501(c)(3) and exempt from tax under section 501(a), NIH is an instrumentality of

the United States, and the petitioner excluded only $3,500. Whether the petitioner is entitled to that limited exclusion depends on whether the stipend received by him was a fellowship grant under section 117(a).

Although the statute fails to define either of the terms "scholarship" or "fellowship grant," section 1.117–3(c) of the Income Tax Regulations provides:

A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. * * *

In addition, section 1.117–4 of such regulations states:

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) * * * any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

Thus, under such regulations, the distinction between a fellowship grant and a payment of compensation turns on whether the primary purpose for making the grant was to enable the recipient to pursue study or research to further his education or training in his individual capacity or whether the primary purpose was to compensate him for past, present, or future services. *Robert W. Carroll*, 60 T.C. 96 (1973); *Elmer L. Reese, Jr.*, 45 T.C. 407, 410–411 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967).

In *Bingler* v. *Johnson*, 394 U.S. 741, 751 (1969), the Supreme Court upheld the validity of section 1.117–4(c) of the regulations and stated that the definition provided therein properly comports with the ordinary understanding of the terms "scholarship" or "fellowship grant" as "relatively disinterested, 'no-strings' educational

grants, with no requirement of any substantial *quid pro quo* from the recipients."

The petitioner contends that the stipend was advanced to aid him in the pursuit of study and research for the primary purpose of furthering his own education and training. On the other hand, the respondent contends that the hospital should be considered the grantor and that it advanced the stipend to compensate the petitioner for present or future services and for studies or research primarily for its own benefit. Although we agree with the respondent that the hospital should be considered the grantor of the stipend and that its motive in extending the grant is determinative, we are convinced, on the basis of all the relevant evidence in the record, that the grant was made to the petitioner primarily for the purpose of enabling him to pursue additional training for his own development.

Initially, it is clear that the hospital should be considered the grantor of the stipend. The NIH grant was given directly to the hospital; it chose the petitioner to participate in the program; and thereafter, it controlled and was responsible for the training he received. See *Robert W. Willie*, 57 T.C. 383, 389–390 (1971); *Frederick Fisher*, 56 T.C. 1201, 1214 (1971).

The purpose of the hospital in making the grant is, in large part, suggested by the nature of the activities carried on by the petitioner. *Thomas P. Phillips*, 57 T.C. 420, 424 (1971); *Irwin S. Anderson*, 54 T.C. 1547, 1550 (1970); *Stephen L. Zolnay*, 49 T.C. 389, 395 (1968). In *Frederick A. Bieberdorf*, 60 T.C. 114 (1973), this Court held that a stipend received by a taxpayer in a medical training program for doctors supported by NIH was an excludable fellowship grant where the program was established for the purpose of training the individual in his own capacity and the services such individual performed were minimal and only incidental to his training. In the present case, the record indicates not only that the program in which the petitioner participated was established for training, but that the petitioner performed no substantial services for the hospital. He had no routine duties, had no responsibility for the care and treatment of patients, and did not make rounds unless supervised by the senior staff. Additionally, he was not considered an employee by the hospital, as were residents and interns, and did not receive fringe benefits normally available to hospital employees. Compare *Parr* v. *United States*, 469 F. 2d 1156 (C.A. 5, 1972); *Hembree* v. *United States*, 464 F. 2d 1262 (C.A. 4, 1972); *Frederick Fisher*, 56 T.C. at 1212; *Aloysius J. Proskey*, 51 T.C. 918 (1969); *Elmer L. Reese, Jr.*, 45 T.C. at 411.

The petitioner's activities in transcribing the observations and directions of the senior staff on the charts of the patients and in making suggestions during the rounds were clearly of minimal value to the

hospital and no reason for compensation. Dr. Hampers testified that the petitioner was asked to transcribe the staff notes in order to further his training, and we have no reason to doubt such testimony. Nor do we doubt that it would have been more efficient for the senior staff to transcribe their own notes. In evaluating the suggestions made by the petitioner, it should be remembered that the senior staff were preeminent in their field. In view of that fact, it seems clear that the petitioner's suggestions did not make a substantial contribution to the care of the patients; it also seems equally clear that the suggestions made by the petitioner did not constitute teaching of the interns and residents who accompanied the senior staff and the petitioner on their rounds. In the light of the experience and reputation of the senior staff, the hospital clearly had no reason to compensate the petitioner for the suggestions that he may have made during the course of the rounds. Accordingly, we are convinced that the petitioner's activities while in the hospital indicate that he was paid to study, and not to perform services.

We reach the same conclusion with respect to the petitioner's activities in the laboratory during the latter half of 1967. The respondent contends that during this phase of the training, the petitioner was paid to perform research. We disagree. The hospital remained the grantor during this phase of the training, and it had only incidental interest in the research performed by the petitioner at the laboratory. The laboratory was funded by its own research grant, no part of which was used to pay the petitioner, was located in a different part of the greater Boston area, and was not affiliated with the hospital, although both were affiliated with Harvard Medical School, and Dr. Hampers was on the staff of both institutions. In these circumstances, any benefit the laboratory may have received from the training and research cannot be attributed to the hospital. Compare *Robert W. Carroll*, 60 T.C. 96 (1973), and *Jerry S. Turem*, 54 T.C. 1494 (1970), where the mutuality of interests and the expectation of common benefits led the Court to conclude that either of two organizations or local governments could be considered the grantor.

Even if we were to conclude that the laboratory and the hospital were in essence one entity for purposes of the petitioner's training and stipend, the record still does not support the contention that the petitioner was paid to perform research. Trainees in the hospital's cardiorenal training program generally did not perform research at the laboratory, and the petitioner was assigned there specifically because he needed training in the laboratory sciences. Had the laboratory been seeking assistance in carrying out its research program, it seems clear that they would have selected a trainee with a strong background in laboratory techniques and basic science, and not the petitioner, or that

they would have employed an additional technician. Compare *Aloysius J. Proskey, supra; Stephen L. Zolnay, supra; Ethel M. Bonn*, 34 T.C. 64 (1960); cf. *Robert Henry Steiman*, 56 T.C. 1350, 1356 (1971). However, the only person assigned to the laboratory was the petitioner, and the record clearly indicates he needed the training and was assigned to the laboratory for that reason. In these circumstances, any benefit received by the laboratory was negligible and only incidental to the petitioner's training. Sec. 1.117-4(c), Income Tax Regs.

The respondent draws our attention to the increased stipend received by the petitioner during his second year in the program. The respondent argues that under the policy of the Public Health Service, such increase was based upon relevant postdoctoral experience and was the result of negotiations, both strong indicia that the petitioner was an employee of the hospital and that the stipend was given only as a *quo* in return for the *quid* of services rendered. See *Aloysius J. Proskey*, 51 T.C. at 924; see also *Bingler* v. *Johnson*, 394 U.S. at 757–758; *Jerry S. Turem*, 54 T.C. at 1504–1505. Although we agree that these are important factors, the record as a whole leads us to conclude that the payments were not compensation.

A distinctive feature of a scholarship or fellowship grant is that the level of the stipend received by the taxpayer is dependent upon the need of the recipient. *Robert Henry Steiman*, 56 T.C. at 1355; *Aloysius J. Proskey*, 51 T.C. at 924; *Edward A. Jamieson*, 51 T.C. 635, 639 (1969). Where the need of the recipient has been considered in determining the level of the stipend and no real or substantial services were performed by such recipient, we have held that such stipend is an excludable scholarship or fellowship grant. *Robert Henry Steiman*, 56 T.C. at 1355. However, where the level of the stipend is dependent upon factors other than need, such as previous salary, experience, or length of service, this Court and others have held such stipends are not subject to the exclusion of section 117. See, e.g., *Bingler* v. *Johnson*, 394 U.S. at 756–757; *Frederick Fisher*, 56 T.C. at 1213; *Aloysius J. Proskey*, 51 T.C. at 924.

The record in this case indicates that while a participant in the cardiorenal training program in 1967, the petitioner was supporting his mother in Virginia. She was claimed as a dependent on his income tax return for such year, and he received an additional support allowance of $500 under the NIH grant. He also contributed to the support of his teenage sister. Even with the additional allowance, by late August or early September, the petitioner encountered financial difficulty in remaining in the program, and therefore asked Dr. Merrill to increase his stipend. Although Dr. Merrill may have justified such increase to NIH on the basis of the petitioner's experience, the increase was requested because of the petitioner's need. The increase did not

follow automatically from the petitioner's experience, and the negotiations involved in such increase centered on the need of the petitioner. In view of these circumstances, the facts that the amount of the grant was influenced by the petitioner's experience and that it followed negotiations are not sufficiently indicative of compensation to overcome the other indications that the grant was for training.

The respondent also argues that the hospital selected the petitioner for the training program with the expectation that he would thereafter be qualified to become a full-time member of the staff of the hospital. Such mere expectation, the respondent would have us conclude, is enough to support a conclusion that the payments are in effect compensation for future services. We disagree.

Where a taxpayer receives a training stipend, such stipend is not excludable if the recipient is contractually obligated to enter the employ of the grantor at the conclusion of the training (*Bingler* v. *Johnson*, 394 U.S. 741 (1969); *Leonard T. Fielding*, 57 T.C. 761 (1972); *Lowell D. Ward*, 55 T.C. 308 (1970), affirmed per curiam 449 F. 2d 766 (C.A. 8, 1971)), or if the grantor awards the stipend with a clear expectation of future employment services (*Lawrence A. Ehrhart*, 57 T.C. 872 (1972), affd. 470 F. 2d 940 (C.A. 1, 1973); *John E. MacDonald, Jr.*, 52 T.C. 386 (1969)). We have found as fact that the petitioner was not contractually obligated to join the staff of the hospital at the conclusion of his training, and we are not persuaded that the hospital made the grant with the clear expectation of receiving future services. The cardiorenal training program at the hospital was established to instruct the trainees in the procedures of hemodialysis and kidney allografting in order that they might one day be qualified to serve on the staff of any cardiorenal section in the world. Whether or not the trainees served at the hospital was of no consequence; some did, and some did not. In contrast, in both the *Ehrhart* and *MacDonald* cases, the records were replete with evidence indicating that the programs were established by the grantors not only to qualify the trainees but to reap the benefits of having highly qualified employees on their staffs. In *Lawrence A. Ehrhart*, 57 T.C. at 881, all trainees were required to be employees of the grantor insurance companies during the period of training, and could not continue in the program in the event of dismissal from such sponsoring companies; and in *John E. MacDonald, Jr.*, 52 T.C. at 392, the Court found that the specific purpose of the program was to obtain the services of highly qualified personnel. See also *Michael A. Smith*, 60 T.C. 279 (1973); *Robert W. Willie*, 57 T.C. 383, 390–391 (1971). The absence of any expectation on the part of the hospital that its trainees would serve on the cardiorenal staff makes the cases relied on by the respondent inapposite. Although the petitioner did in fact join the hospital's cardiorenal

staff, he did so after considering various offers; the offer of the hospital was merely the most attractive.

We, therefore, hold that the stipend received by the petitioner was granted for the primary purpose of training him in his own capacity, and accordingly, is excludable from income to the limited extent provided by section 117 (a) and (b) (2).

*Decision will be entered for the petitioner.*

