PAUL R. ZEHNDER and MARTHA J. ZEHNDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Zehnder v. Commissioner
Docket No. 8332-71.
United States Tax Court
T.C. Memo 1973-253; 1973 Tax Ct. Memo LEXIS 32; 32 T.C.M. (CCH) 1189; T.C.M. (RIA) 73253; November 21, 1973, Filed *32 Held: That the stipend received by petitioner from Charity Hospital in 1968 was not a "fellowship grant" within the meaning of section 117(a) (1) (B), I.R.C. 1954, and petitioner is not entitled to any exclusion therefor. Paul R. Zehnder, pro se. Bruce A. McArdle, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION
*33 BRUCE, Judge: Respondent determined a deficiency in the income tax of the petitioners for the year 1968 in the amount of $358.01.The issue is whether the petitioners are entitled to exclude $1,800 from their gross income in 1968 as a 2 scholarship or fellowship grant under section 117[1] while petitioner Paul R. Zehnder (hereinafter referred to as petitioner) was serving as a resident in otolaryngology [2] at Charity Hospital of Louisiana at New Orleans (hereinafter referred to as Charity). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Paul R. Zehnder and Martha J. Zehnder are husband and wife who were legal residents of Gretna, Louisiana when the petition herein was filed. Petitioners filed a joint Federal income tax return (Form 1040) for the taxable year 1968 with the district director of internal revenue, New Orleans, Louisiana. Petitioner received a degree of Doctor of Medicine from *34 Louisiana State University, School of Medicine, in June 1964. After receipt of the degree petitioner in June 1964, qualified and was licensed as a physician by the Louisiana State Board of Medical Examiners. 3 From July 1964 through June 1968, petitioner served in the United States Air Force, Medical Corps, where as a fully qualified and licensed physician he successfully completed his internship at Wilford Hall United States Air Force Hospital, San Antonio, Texas. Thereafter, he practiced general medicine and was a flight surgeon or medical officer throughout the remainder of his military career. During his military career petitioner received approximately $12,000.00 per year as compensation for his medical services. During the period of his military career Dr. Zehnder also qualified and was licensed to practice medicine in the State of California. Beginning in July 1968, Dr. Zehnder commenced participation in a residency program specializing in otolaryngology at Charity. As a prerequisite for participation in the Charity residency program, the applicant must have graduated from an approved medical school, have been licensed to practice medicine in the State of *35 Louisiana and have served one year of approved internship. A Charity resident during its fiscal year ending June 30, 1969 (hereinafter referred to as fiscal year 1969), had direct responsibility for the care and treatment of his assigned patients. In carrying out his responsibility the petitioner conducted the initial standard interview and examination which included taking 4 a complete medical history of the patient, making a physical examination, doing laboratory diagnostic tests, arriving at a diagnoiss, preparing and carrying out a treatment plan, prescribing and administering medication, and finally disposing of the patient by hospitalizing, assigning to a clinic, or discharging him. A patient's complete medical history included the chief complaint of the patient, his present illness, his past history, a review of systems, a family history, and a social history. A complete physical examination included an examination of the patient's general condition, vital signs and findings pertaining to skin, lymph nodes, head, neck, eyes, ears, nose, throat, heart, lungs, abdomen, genitalia, peripheral blood vessels, muscular-skeletal system, nervous system, rectal and vaginal. *36 Unless otherwise specified, each patient on each admission had to have a complete history and physical examination. If so specified, patients admitted to Charity need only have a brief history and brief physical examination taken. A brief history consisted of a listing of the present illness and important findings in the patient's past history and a review of the patient's systems. 5 A brief physical examination included an examination of the patient's general condition, vital signs, heart, lungs, and organ-system concerned in the present illness. Based upon the interview and physical examination, including the laboratory tests administered, and the patient's history, the resident would record a tentative working diagnosis on the patient's medical record, and such record would be signed by the resident. The resident was required to enter progress notes, at least twice weekly, on his patients' medical history records, such notes including treatment, response to the treatment, complications, comments of other physicians and conference decisions. Upon discharge of his patient, a written discharge summary or "face sheet" was required to be completed by the resident, *37 which would indicate a brief history of the patient, the patient's condition at the time of discharge, the treatment and progress of the patient up to the time of discharge, and the final diagnosis and recommendations with respect to the future treatment or medication to be administered to the patient. 6 A resident who signed a "face sheet" when a patient was discharged from the hospital assumed the responsibility for the entire medical record, regardless of whether such resident performed the initial work-up or whether the patient was transferred from another service. If such record was inadequate, the resident signing the "face sheet" was responsible for having it completed satisfactorily.
If the resident's patient were to die in the hospital, the resident would be required to complete and execute the death notice. Upon entry of service at Charity residents were required to fill out forms contained in an employee packet. The forms related to Federal and state income tax withholding and with social security taxes. Federal social security taxes were withheld by Charity from the payments received by the residents in 1968. However, no Federal income tax was withheld by *38 Charity from the petitioner's pay in 1968. In fiscal year 1969 when petitioner begain his first year of residency at Charity he was paid $475.00 per month ($5,700 per year) and received $25.00 per month maintenance fee ($300.00 per year). In fiscal year 1969 when petitioner was assigned to the 7 admit room he would receive $500.00 per month ($6,000.00 per year), plus a $25.00 montly maintenance fee. In the fiscal year 1970 petitioner received $525.00 per month ($6,300.00 per year) plus a $25.00 monthly maintenance fee. During that period he was classified as a third year resident because of a change in the residency program approved by the Board of Administrators of Charity which required that the petitioner "skip" his second year of residency. At that time all first year residents received $475.00 per month and all residents second year and above received $525.00 per month. On September 1, 1969, petitioner received a salary increase as a third year resident to $725.00 per month ($8,700.00 per year) plus $25.00 maintenance fee per month. The increase of September 1, 1969, was due to a recommendation by the head of the department. At the same time, all first year residents' *39 pay had been increased to $650.00 per month ($7,800.00 per year) and all residents second year and above received $700.00 ($8,400.00 per year) per month. The increase in pay received by petitioner from his first year residency pay of $475.00 per month to his third year residency pay of $525.00 per month was based on his year's experience as a resident. His increase in pay from $525.00 per month as a third year resident to $725.00 per month as a 8 third year resident was in part due to the overall pay raise recieved by all residents and in part due to a recommendation by the head of the department. The pay increases between first and second years of residency were based on years of experience and residency rather than on the individual's need for funds. During his residency petitioner was not a candidate for a degree. Residents at Charity are furnished free uniforms, parking, and in the case of unmarried residents, living quarters. They may also use the hospital's gymnasium, recreation room and recreational equipment, and they and their immediate families were entitled to free medical care, including obstetrical care, in the hospital infirmary. Although on call at *40 all times, the regular work schedule of the residents at Charity consisted of a work week of five or six days, 7:00 a.m. to 4:00 p.m. After 4 p.m., provided routine necessary work had been completed, residents could check out of Charity. The rules and regulations of Charity provided that under no circumstances were residents to leave the hospital between 7:00 a.m. and 4:00 p.m. Charity's rules and regulations required that at all times a resident must be on call for every ward patient in the hospital. 9 Residents at Charity attended lectures, conferences, anatomical dissections, and research studies carried out in the medical schools. They were also generally required to supervise interns. Each resident at Charity is granted, if possible, one month's vacation with pay in the course of a one-year term of residency. Petitioner received a vacation with pay as a resident at Charity during the 31-day period beginning December 1, 1968 through December 31, 1968. Charity is owned and supported by the State of Louisiana and is operated primarily to provide medical care and treatment for indigent residents of Louisiana. Charity is closely affiliated with both Tulane and Louisiana *41 State University (LSU) Schools of Medicine. Both the intern program and the residency program at Charity are under the direction of two general medical divisions, the Tulane division and LSU division. Each of these divisions are composed of physicians and surgeons associated with the specific division. Residency is offered in all specialties in both divisions. A program director in each specialty is also the chairman of the department of that specialty in the respective medical school.Residents are appointed to the Tulane or LSU 10 divisions depending on their preference. The residency program of each division is under the supervision of the faculty of the corresponding medical school. During the fiscal year 1969 the non-intern, non-resident, paid physicians on the staff of Charity totaled 65 physicians, of which approximately one-half were full-time staff physicians. The non-intern, non-resident physicians on the full-time staff of Charity had administrative duties. The medical staff of Charity totaled approximately 700 physicians. There were approximately 100 interns and 300 residents in service at Charity during the fiscal year 1969. During that same period, 11 *42 residents were in the LSU division of the otolaryngology department and 9 residents were in the Tulane division of that department. Petitioner was a first-year resident in the LSU division of the otolaryngology department during fiscal year 1969. During fiscal year 1969, Charity had 20,629 clinical service outpatient visits in its otolaryngology department and 1,177 inpatient admissions to that department. A great portion of the responsibilities associated with the regular care and treatment of patients at Charity was performed by residents and interns and without their services Charity would have been forced to pay other doctors or call 11 upon volunteer doctors to perform the services performed by the interns and residents. Adequate financing has been a constant administrative problem at Charity. OPINION Petitioner, not a candidate for a degree, served as a resident in otolaryngology in the second half of 1968 at Charity Hospital, New Orleans, Louisiana. It is his contention that $1,800 of the stipend received by him in that year is excludable as a fellowship grant under section 117(a) (1) (B). Respondent has determined that the amounts received by petitioner were *43 fully taxable to him as compensation for services rendered under section 61. For the reasons discussed below, we sustain respondent's determination in this case. Section 117 provides, in the case of an individual, that gross income does not include any amount paid as a fellowship grant. The exclusion under section 117(a) (1) is limited by section 117(b) (2) to $300 per month for any individual receiving a scholarship or fellowship who is not a candidate for a degree at an educational institution defined in section 151(e) (4). t is well settled that before the exclusionary provisions of section 117 become operative, it must first be established 12 "that the payment sought to be exluded has the normal characteristics associated with the term "scholarship."" Elmer L. Reese, Jr., 45 T.C. 407, 413 (1966), affirmed per curiam 373 F.2d 742 (C.A. 4, 1967). Section 1.117-3 of the Income Tax Regulations defines the term "fellowship grant" as "an amount paid or allowed to, or for the benefit of an individual to aid him in the pursuit of study or research." Whether a particular amount satisfies this general definition depends upon the nature of the activities *44 carried on by the recipient. Section 1.117-4(c) [3]13 of the Regulations provides that a payment will be considered to be a fellowship grant for the purpose of section 117, if "the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity." If, however, a payment represents compensation for employment services or for services which are subject to the supervision of the grantor, it is not excludable as a fellowship grant. See, Irwin S. Anderson, 54 T.C. 1547 (1970); Aloysius J. Proskey, 51 T.C. 918 (1969). *45 In Bingler v. Johnson, 394 U.S. 741, 751 (1969), the Supreme Court approved the definitions contained in these Regulations by stating that they "are prima facie proper, comporting as they do with the ordinary understanding of 14 "scholarships' and "fellowships' as relatively disinterested, "no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." In Parr v. United States, 469 F.2d 1156 (C.A. 5, 1972), the court there was faced with a situation similar to that in the present case. In Parr, Dr. Parr, a first-year resident in orthopedic surgery and Dr. Emerson, a second-year resident in general surgery, were being paid by Shands Teaching Hospital and the University of Florida Hospital College of Medicine, respectively. Both of the hospitals were referral hospitals receiving more applications for patient admission than they accepted and patients were accepted largely on the basis of their educational value to the "students." The taxpayers, as doctors at their respective hospitals, make rounds, saw patients, took histories, proposed diagnosis, and gave pre- and post-operative care, and assisted in and performed *46 surgery under the supervision of faculty members. The testimony was undisputed that the facilities would have had to hire other personnel to undertake the duties had they not been performed by Doctors Parr and Emerson. Both Parr and Emerson excluded their pay from their respective hospitals from their gross incomes pursuant to section 117. The Commissioner of Internal Revenue determined that such excluded amounts were includable 15 in the taxpayers' gross income pursuant to section 61. In the consolidated actions separately filed by each of the doctor-taxpayers for refunds, the United States District Court for the Northern District of Florida granted the Government's motion for summary judgment. The United States Court of Appeals for the Fifth Circuit affirmed the decision of the District Court, stating, inter alia: The recent opinion of Judge Field for the Fourth Circuit in Hembree v. United States, 4 Cir., 464 F.2d 1262 (1972), on nearly identical facts, squarely holds that the primary purpose for which the medical institution is operated is not significant. The primary purpose standard of the regulations relates to the purpose for which the payments are *47 made. The Court there held that a showing that the Doctor performed services as part of his internship duties which were necessary to the operation of the hospital and would have to be performed by others were the Taxpayers to be excused from their performance, demonstrated that the relationship between hospital and "student" had all the indicia of an employer-employee relationship. The hospitals here in many respects treated Appellants as employees and we think that the evidence demonstrates beyond dispute that for the purposes of Federal Income Tax liability they were employees. As the Court in Hembree, supra, points out the Supreme Court's decision in Bingler v. Johnson, 1969, 394 U.S. 741, 89 S. Ct. 1439, 22 L. Ed. 2d 695 provides an additional basis for our holding apart from the "primary purpose" 16 concept. The Supreme Court there adopted a common sense approach to the definition of scholarships and fellowships characterizing them as "relatively disinterested, "no-strings' educational grants." We hold that as a matter of law there were strings attached to the grants in the case before us, which exceeded the incidental duties which are compatible *48 with characterization of a stipend as a scholarship or fellowship. [469 F.2d 1156, 1157-1158; footnotes omitted.] Likewise, in Rundell v. Commissioner, 455 F.2d 639 (C.A. 5, 1972), affirming per curiam a Memorandum Opinion of this Court (30 T.C.M. 177), the Fifth Circuit held that amounts received by a resident in general surgery at St. Paul Hospital, Dallas, Texas, were includable in the gross income of the taxpayer pursuant to section 61 rather than being excludable pursuant to section 117. In that case, the taxpayer worked at a hospital operated primarily for the care and treatment of patients and performed a wide range of duties in his capacity as a resident. Moreover, the director of the hospital's department of medical education testified that due to the resident's being on the hospital's medical staff the patients got better care. He also testified that with the residents on the staff there was better control and more careful supervision of the patients. 17 In the present case, the petitioner, like the taxpayers in Parr and Rundell, was performing substantial services in his capacity as a physician. He had a direct responsibility *49 for the care and treatment of his assigned patients. In carrying out this responsibility he would conduct an initial standard interview and physical examination of his patients. Petitioner would also conduct laboratory diagnostic tests, prepare and carry out treatment plans, prescribe and administer medication and finally dispose of patients either by hospitalizing them, assigning them to a clinic, or discharing them. Also, as in Parr and Rundell, the hospital treated its residents as employees rather than as students. Petitioner had regular working hours during which he could not leave the hospital and was on call at all times. He received an increase in pay after his first year of residency and was given a paid vacation. He was furnished free parking and uniforms, and use of the hospital's recreational facilities. Free medical services were also available to the members of his family by the hospital infirmary. These facts are generally considered as indicia of an employer-employee relationship. 18 We also note that Federal social security taxes were withheld from the amounts paid petitioner by the hospital but that no Federal income taxes were withheld. Weldon Talley, *50 treasurer of Charity, testified that social security taxes were withheld under direction of Mr. Toughwell, a State official who dealt with the Federal government concerning such matters. Federal income taxes were not wihheld because the Board of Administrators and Director of the hospital "had ruled that this would be a stipend rather than salary." Both social security taxes and Federal income taxes arise out of an employer-employee relationship. Subtitle C (section 3102 et seq.) of the 1954 Code. The treatment accorded them by the hospital was clearly inconsistent. The question whether, for Federal income tax purposes, the amounts paid petitioner during the taxable years involved was taxable income is one for this Court to determine and we are not bound by the ruling made by the Board of Administrators and Director of the hospital. We have carefully considered, but find no merit in petitioner's arguments regarding the uniqueness of a medical education and the importance of patient contacts. As stated by the Fifth Circuit in Parr: 19 It is likewise clear that Taxpayers attended these institutions for the purpose of advancing their medical knowledge, that is, to become *51 specialists in their respective fields. These facts, however, do not shake us in our conclusion that the overwhelming case law and common sense stand between Taxpayers and the Federal Treasury. Frederick A. Bierberdorf, 60 T.C. 114 (1973), and George L. Bailey, 60 T.C. 447 (1973), in which this Court reached different results, are factually distinguishable from the present case. For the reasons discussed herein, we hold that the stipend received by petitioner from Charity Hospital in 1968 was not a "fellowship grant" within the meaning of section 117(a) (1) (B), and petitioner is not entitled to any exclusion therefor. Anderson, Parr, and Rundell, all Supra. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
2. Otolaryngology is that branch of medicine dealing with the ear, nose, and throat. ↩
3. Sec. 1.117-4 Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) * * * any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117↩ if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.