LAWRENCE A. AND MELANIE D. EHRHART, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THOMAS P. AND JOANN M. TIERNEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2597–70, 2911–70, 5788–70.   Filed March 28, 1972.

---

Lawrence A. Ehrhart, pro se, for the petitioners in docket Nos. 2597–70 and 5788–70.

Thomas P. Tierney, pro se, for the petitioners in docket No. 2911–70. *Edward DeFranceschi*, for the respondent.

The Commissioner determined deficiencies in petitioners' income tax as follows:

| Year | Petitioners Ehrhart | Petitioners Tierney |
|---|---|---|
| 1966 | $114, 75 | |
| 1967 | 377. 96 | $344. 03 |
| 1968 | 268. 75 | 222. 88 |

The only issue for decision is whether amounts received by petitioners Lawrence A. Ehrhart and Thomas P. Tierney, respectively, were excludable from gross income as "scholarship[s]" or "fellowship grant[s]" under section 117(a)(1), I.R.C. 1954.

FINDINGS OF FACT

The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference.

Lawrence A. and Melanie D. Ehrhart, petitioners in docket Nos. 2597–70 and 5788–70, are husband and wife. They filed joint Federal income tax returns for the calendar years 1966, 1967, and 1968 with the district director of internal revenue at Boston, Mass., and resided in Boston, Mass., at the time their petitions herein were filed.

Thomas P. and Joann M. Tierney, petitioners in docket No. 2911–70, are husband and wife. They filed joint Federal income tax returns for 1967 and 1968 with the district director of internal revenue at Boston, Mass., and resided in Framingham, Mass., at the time their petition herein was filed.

Petitioners Lawrence A. Ehrhart (Ehrhart) and Thomas P. Tierney (Tierney) are employed by New England Mutual Life Insurance Co. (New England Mutual) and the John Hancock Mutual Life Insurance Co. (John Hancock), respectively. Both Ehrhart and Tierney (petitioners) have been trained as actuaries. Actuaries are highly skilled mathematicians who deal with various contingencies affecting human life. They function primarily as technical experts of life insurance companies, but their broad understanding of the life insurance business frequently enables them to rise to nonactuarial managerial or executive positions.

To become recognized as a fully qualified actuary, one must pass a series of 10 examinations administered by the Society of Actuaries, the authoritative organization which establishes the qualifications of actuaries in the life insurance industry. One who successfully completes all 10 examinations becomes a fellow of the Society of Actuaries. The examinations are offered in two sittings each year, one in the spring and the other in the fall, usually in May and November. Most candidates take one examination at a sitting, although it is not uncommon to take two examinations at one time, particularly those involving parts 1, 2, and 3. Examinations for parts 1, 2, and 3 are offered at each sitting; as to the remaining seven parts, examinations for odd-numbered parts are given in the fall and the even-numbered parts in the spring. The examinations are quite difficult, and the length of time required to become a fellow is usually not less than 5 or 6 years; the great majority of persons who sit for the first examination do not survive to become fellows.

There has been an acute shortage of qualified actuaries for a number of years, prior to, during, and subsequent to the tax years here involved. In an effort to help relieve that shortage there was established at Northeastern University in 1964 a Graduate School of Actuarial Science ("Northeastern" or the "school"), which offered a 2-year course leading to the degree of master of actuarial science. The nature of the school was unusual. It was established with the aid of and functioned in conjunction with some 40 "sponsoring" life insurance companies or institutions or agencies (sometimes referred to herein generally as insurance companies) that utilized the services of actuaries and were therefore interested in increasing the number of available qualified actuaries.

The course of study at the school was designed to prepare students for parts three through six of the examinations given by the Society of Actuaries. As a prerequisite to matriculation a student was required to have passed the first two examinations, or to have demonstrated clearly his ability to pass such examinations. Each year of the 2-year course was divided into two semesters of 10 weeks each, and each semester was devoted exclusively to preparing the student to take a particular examination. Thus, the first semester of the first year was aimed at part three, and the second semester at part four; similarly, the first and second semesters of the second year were concerned exclusively with the materials covered by parts five and six, respectively. Each semester was so scheduled that it terminated shortly before the Society of Actuaries gave the particular examination with which that semester was concerned. Moreover, the framework of the 2-year course was so constructed that there was a 16-week interval between each semester and the one following it.

The school was unusual in the further respect that it would admit as students only those who were employees of and sponsored by one of the cooperating insurance companies. No student whose employment relationship with his sponsor had terminated—whether by his own choice or his sponsor's—was allowed to remain in the school after completion of the semester in which he was enrolled at the time of severance of his employment. It was also a condition that each student work or serve as an "intern" for his sponsor during the 16-week periods between semesters, and that his performance during such periods be satisfactory. During the 10-week periods when the employee attended the school as a student, his efforts were directed exclusively towards his studies and, unlike the 16-week periods between semesters, he did not perform any services for his employer. No prospective student, however qualified, was eligible for admission to the school unless he was an employee of a sponsoring company, although it was possible for one to become an employee at the same time that he was accepted as a student. The faculty of the school consisted of three full-time teachers plus an undisclosed number of part-time teachers, some of whom were officers or employees of the sponsoring insurance companies.

Pursuant to the arrangement between Northeastern and the insurance companies, the tuition fee for each student was required to be paid by his sponsor, and not by the student himself. In addition, it was the practice of at least some of the companies to pay their employees a "living allowance" during the 10-week periods when they were attending sessions at Northeastern. Both Tierney and Ehrhart received such allowances from their respective employers, more fully hereinafter described, and the sole issue is whether those allowances were excludable from gross income as fellowships or scholarships under section 117 of the 1954 Code.

Tierney received a B.S. degree in physics from Boston College in 1964, and became a "programmer" in John Hancock's computer department on March 30, 1965. Approximately 9 months later, in early January 1966, he transferred to the company's special training program for prospective actuaries (the actuarial development program) where he remained a full-time employee and was compensated as such. About this time he learned that John Hancock offered to sponsor the Northeastern education of a limited number of participants in its actuarial development program. He was approved for sponsorship, applied to and was accepted by Northeastern, and entered school in late August or September of 1966.

Ehrhart became interested in becoming an actuary while he was an undergraduate student at the University of North Carolina, where

he took the only actuarial courses offered at that university. He viewed the actuarial profession as a means to his ultimate goal of a managerial career with a life insurance company. In November 1965, during his senior year at college, Ehrhart received a letter from Northeastern, informing him of its graduate program in actuarial science. Shortly thereafter, he was interviewed in Boston by Northeastern's Dean Geoffrey Crofts, who described the Northeastern program, informed him that he would have to find a sponsor, and referred him to New England Life. When New England Life subsequently offered to employ him and to sponsor his Northeastern education, Ehrhart accepted, giving up an opportunity to pursue a graduate degree in economics at the University of North Carolina. After his graduation from college in the late spring of 1966, he began working in New England Life's actuarial student program on July 5, 1966, and enrolled at Northeastern in late August or September of 1966.

The principal reason for both New England Life's and John Hancock's sponsorship of Northeastern students was to increase the practical availability of actuarial talent to each company during a period when an acute shortage of actuaries afflicted the life insurance industry. The combination of advantages which Northeastern offered to an actuarial student—formal instruction, a degree, and the opportunity to devote a total of 40 weeks exclusively to his studies—was unique in New England. Although the companies themselves provided on-the-job training which was useful to persons preparing for the actuarial examinations, such training, standing alone, lacked the obvious advantages offered by Northeastern when combined with on-the-job training. Sponsorship of Northeastern students thus gave the companies an opportunity to attract employees they might not otherwise have reached, in the manner that Ehrhart was attracted to New England Life. Moreover, by presenting itself as an appealing place to work during the work periods, each company hoped to induce students it sponsored to remain as permanent employees, although students were not obligated, either as a condition of their sponsorship or by separate agreement, to work for New England Life or John Hancock after graduation from Northeastern.

Despite the reinforcement of their recruiting efforts by reason of their sponsorship of Northeastern, both companies proved to be less successful in retaining Northeastern graduates than other actuarial trainess who had not attended Northeastern. However, most students apparently did return to these companies for some period of time, although they tended to leave more quickly than other participants in each company's actuarial program. Moreover, the value of a North-

eastern graduate's education was not always lost to the company if he left its actuarial development program. Such persons were occasionally retained in other capacities in which their Northeastern training enhanced their usefulness to the company.

A further reason for sponsoring Northeastern students was the hope that the educational advantages of attending Northeastern would enable their students to become fellows of the Society of Actuaries in less time than they might otherwise have required. The companies stood to benefit by the more rapid professional qualification of their employees.

In addition to paying their tuition at Northeastern, both New England Life and John Hancock paid students a living allowance to cover personal expenses incurred during the 10-week semesters, notwithstanding that Northeastern did not require the payment of such allowances. During the years Tierney attended the school, John Hancock provided living allowances in the amounts of $80 per week to students enrolled in the first two terms of the Northeastern program and $100 per week to those enrolled in the last two terms. The $20 per week increase in the second year was granted irrespective of whether or not a given student had passed the third and fourth actuarial examinations. At the time Ehrhart entered Northeastern, the allowances paid by New England Life, which also were determined without regard to a student's performance on the examinations, amounted to $50 per week for single persons and $75 per week for married persons. These amounts were raised at least twice while Ehrhart was in school. At some time prior to Tierny's enrollment in Northeastern, the living allowances paid by John Hancock had also been higher for married students than for single persons, but this distinction had been eliminated before the fall of 1966. Petitioners' living allowances were reflected on their respective Treasury Department Forms W-2 for each of the years in controversy.

During the 10-week semesters, Northeastern students were not subject to their sponsors' supervision, and their studies could not be interrupted to fulfill their sponsors' emergency work needs. Neither Ehrhart nor Tierney performed any direct services during such periods for his respective employer. Each petitioner's annual salary for each of the years he attended Northeastern was reduced in proportion to the number of weeks per year he was on leave, or 20/52nds for a full year. John Hancock simply suspended the payment of Tierney's regular weekly salary during the study periods and substituted the payment of his living allowance. New England Life paid Ehrhart a uniform monthly amount over each full year, which was determined

by dividing by 12 the sum of his aggregate prorated salary plus his aggregate living allowance for such year. Each petitioner's rate of compensation during the work periods reflected the number of actuarial examinations he had passed, as did the salaries of all participants in the companies' actuarial student programs, irrespective of whether or not they attended Northeastern. Immediately prior to the date of petitioners' enrollment in Northeastern, Tierney was earning approximately $152 per week and Ehrhart's annual base pay was $7,200. Both petitioners have subsequently received raises which have reflected their examination progress. Ehrhart's level of compensation has consistently been near the top of the scale for New England Life employees at his examination level.

The position of each petitioner in his respective employer's scheme of seniority was determined by the number of examinations he had passed and thus was not disturbed by his attendance at Northeastern. Both petitioners were covered under their companies' group life and health insurance plans while they were in school, although certain benefits of New England Life's health plan were not available to Ehrhart during such periods. The amount of Tierney's life insurance coverage was based on the amount of compensation he would have received had he been a full-time employee of John Hancock during each year of his schooling. The amount of life insurance coverage in Ehrhart's case was based on the payments he actually received from New England Life in each year, including not only his actual salary but also his living allowances. Both petitioners' vacation allowances were reduced roughly in proportion to the fraction of each year they were on leave for school, as was Tierney's annual sick leave allowance. The record does not disclose the effect of Ehrhart's leave of absence on his sick leave. Tierney's pension benefits accrued without interruption while petitioners were at Northeastern; Ehrhart was too young to participate in New England Life's retirement plan at such time.

Ehrhart and Tierney received their masters degrees in actuarial science in June 1968. Although neither petitioner had been contractually bound to his respective employer during his attendance at Northeastern, each had spent all three work periods in the employ of his sponsor as Northeastern required. Ehrhart also returned to New England Life, and Tierney to John Hancock, after their graduation. At the time of the trial herein, Ehrhart had qualified as a fellow of the Society of Actuaries and Tierney had passed 9 of the 10 actuarial examinations. Both petitioners have assumed nonactuarial positions with their former sponsors, but their actuarial backgrounds have been useful to them in their new capacities.

During the years they attended Northeastern, petitioners received living allowances from their employers in the following aggregate amounts:

| Year | Ehrhart | Tierney |
|---|---|---|
| 1966 | $750 | $800 |
| 1967 | 1,716 | 1,800 |
| 1968 | 1,000 | 1,000 |

Petitioner Ehrhart filed joint returns for the calendar years 1966, 1967, and 1968, and petitioner Tierney filed joint returns for the calendar years 1967 and 1968. Each petitioner excluded the living allowances he had received in each of the years in controversy from his gross income, claiming that such allowances constituted scholarships or fellowship grants under section 117, I.R.C. 1954. The Commissioner determined deficiencies against petitioners by reason of such exclusions. The taxability of Tierney's 1966 living allowance is not in issue.

OPINION

RAUM, *Judge:* Section 117(a)(1), I.R.C. 1954,[1] excludes from gross income any amount received "as a scholarship at an educational institution" or "as a fellowship grant." The regulations describe certain payments which are not excludable under section 117, as follows:

Sec. 1.117-4  Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\*      \*      \*      \*      \*      \*      \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is re-

[1] SEC. 117.  SCHOLARSHIP AND FELLOWSHIP GRANTS.
    (a) GENERAL RULE.—In the case of an individual, gross income does not include—
        (1) any amount received—
            (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or
            (B) as a fellowship grant,
    including the value of contributed services and accommodations;

quired to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

The Supreme Court, sustaining the validity of the foregoing regulation in *Bingler* v. *Johnson*, 394 U.S. 741, emphasized that its thrust is to deny an exclusion for payments given in return for a quid pro quo. 394 U.S. at 757–758, fn. 32 at 758. Thus, payments made primarily to reward or induce the recipient's performance of services for the benefit of the grantor, as distinguished from relatively disinterested, "no-strings" payments made primarily for the purpose of furthering the education of the recipient, are not scholarships or fellowships. *Robert W. Willie*, 57 T.C. 383; *Jerry S. Turem*, 54 T.C. 1494, 1505; cf. *Elmer L. Reese, Jr.*, 45 T.C. 407, 411, affirmed per curiam 373 F. 2d 742 (C.A. 4). We think that the stipends here in issue do not constitute scholarships or fellowships under the foregoing criteria.

Petitioners Ehrhart and Tierney were employed by New England Life and John Hancock, respectively, as actuarial trainees. Each petitioner was granted periodic leaves of absence to attend Northeastern University's Graduate School of Actuarial Science, a 2-year, work-study program which prepared students to take a number of examinations necessary for their eventual qualification as actuaries and culminated in the conferment of the degree of master of actuarial science. Both New England Life and John Hancock were part of a group of approximately 40 insurance companies that played an important part in establishing the school and were the sole source of students at the school, all of whom were selected or "sponsored" from among the employees of these companies. While Ehrhart and Tierney were in school, their respective employers not only paid their tuition fees, as required by Northeastern, but also gave them living allowances in lieu of their regular salaries. Such living allowances constitute the subject of the present controversy.

So-called scholarship grants by profit-oriented institutions to present or prospective employees invite careful scrutiny. As we view the entire record, the Northeastern program represented a recruitment and training tool of its collective sponsors. Although the record is rather incomplete in respect of all the circumstances surrounding the creation of Northeastern's Graduate School of Actuarial Science in 1964, it gives rise to a strong inference that the Northeastern program was established at least partly in response to the problem of a seriously short supply of actuaries, which the insurance industry has experienced for a number of years. Northeastern offered its students a combination of advantages which its sponsoring companies could not provide through their own training programs—a formal education, a

degree, and the opportunity to devote a total of 40 weeks over the space of 2 years exclusively to their studies. No other program of its kind was available in New England. The existence of Northeastern could thus be expected to attract a number of persons into the actuarial profession who might otherwise have pursued other careers.

Not only was the Northeastern program likely to enhance the recruitment opportunities of the New England insurance industry in general, but its enrollment requirements were designed to channel students into the eventual employ of their particular sponsors. A student was required to work between study terms for his sponsoring company. If he left his sponsor's employ at any time, he was not permitted to remain in school after the completion of the semester during which he left. By reason of Northeastern's requirement that a person secure employment with a sponsor before his enrollment, prospective sponsors were assured of an advance opportunity to evaluate each candidate's long-range actuarial potential. Thus, the practical advantage of sponsorship to an insurance company was the opportunity to develop a close enough association between itself and its students during the work periods that the latter would be induced to remain after graduation as well-trained, permanent employees. This opportunity was presented not only in respect of students who had originally been drawn to a sponsor by the opportunity to attend Northeastern, but also in respect of other actuarial employees selected by the company to be trained at Northeastern.

That the sponsoring companies have played a significant role in Northeastern's formation and continued existence is clear from the record. The evidence shows that the sponsors contributed substantial supporting grants to Northeastern in its formative years, and have always paid the tuition of their students. Some companies have provided additional indirect monetary support in the form of living allowances to their students. Finally, the school's students and some of its faculty members have been drawn from the ranks of the sponsors' employees.

Whether or not the sponsors had expressly insisted that Northeastern design its enrollment requirements as it did in consideration of the sponsors' collective support, it is plain that New England Life and John Hancock viewed Northeastern as a recruitment and training instrument. The present administrators of both companies' actuarial training programs testified that their respective companies hoped that their students would remain as permanent employees and that their Northeastern education would enable them to become fully qualified actuaries more quickly. The inclusion of petitioner's living allowances on their respective W–2 forms, the continuance of many of their em-

ployee benefits without interruption by their schooling, and New England Life's payment to Ehrhart of a uniform amount—part salary and part living allowance—during every month of each year he attended Northeastern, all suggest that petitioners' respective sponsors regarded them as full-time employees who were simply on school leave. Cf. *Bingler* v. *Johnson*, 394 U.S. at 756–757, fn. 30 at 756 and the cases cited therein; *Jerry S. Turem*, 54 T.C. at 1507; *Aloysius J. Proskey*, 51 T.C. 918, 924.

Petitioners have made much of the facts that they were not legally bound to return to their respective employers between semesters or after school and that both New England Life and John Hancock merely "hoped" ultimately to acquire students as employees. As we explained in *John E. MacDonald, Jr.*, 52 T.C. 386, 393, the absence of a contractual undertaking by the recipient to perform services for his grantor does not make a payment a "scholarship" where the evidence as a whole suggests a contrary conclusion. Although *MacDonald* stated that a "clear expectation" was an adequate substitute for a contractual obligation in such circumstances, we think that its reasoning surely encompasses the present situation. Even if petitioners' respective sponsors merely "hoped" for their eventual return, such hope plainly constituted the heart of their sponsorship objectives. It does not appear that either company was motivated to any substantial degree by the usual disinterested considerations that are characteristic of a true scholarship or fellowship. To the contrary, there is every reason to conclude that the payments were made primarily for the benefit of the companies. In view of the foregoing, it is of no consequence that both New England Life and John Hancock exhibited a higher rate of attrition among their Northeastern graduates than among their other actuarial trainees. Cf. *Robert W. Willie*, 57 T.C. at 390–391.

Petitioners also have attached significance to the disparity between the amounts of their living allowances and their regular salaries, the fact that they were both fully compensated by their regular salaries during all periods when they rendered direct services to their employers, and the substantial educational benefits—and eventually resulting remunerative benefits—which they derived from the Northeastern program. Petitioner Ehrhart additionally stresses that his particular objective at the time he approached New England Life as a prospective sponsor, and throughout most of his time at Northeastern, was to obtain an actuarial education rather than to secure immediate employment. None of these circumstances, however, alters the self-serving character of the insurance companies' sponsorship in these cases. Cf. *Robert W. Willie*, 57 T.C. at 388–390; *Aloysius J. Proskey*, 51 T.C. at 924–925. The point is, both companies reasonably contem-

plated that sponsorship would develop trained employees for them, and the primary object of the Northeastern program was to recruit and train actuaries for the benefit of the sponsoring companies.[2] Considered in the context of the entire sponsorship program, the living allowances paid to the petitioners constituted personnel investments by their respective employers. They hardly represented such disinterested, "no-strings" payments as the regulations contemplate, but rather were made to induce petitioners' performance of services for the benefit of their respective grantors. Cf *Jerry S. Turem*, 54 T.C. at 1507. Therefore, the living allowances do not qualify as scholarships under section 117(a).

Petitioners' reliance on *William Wells*, 40 T.C. 40, and *Laurence E. Broniwitz*, 27 T.C.M. 1088, is misplaced. In each of those cases the Court found that the primary purpose of the grants received by the respective petitioners therein was to further their education in their individual capacities, rather than as prospective employees of the grantor. Such is not the case here. We also note that *Bingler* v. *Johnson*, 394 U.S. at 756, fn. 30, casts doubt on the correctness of the result in the *Broniwitz* case.

Petitioners also contend that the payments are excludable under section 117(b)(1), I.R.C. 1954,[3] and Treasury Department promulgations under that section: sec. 1.117–2(a)(2), Income Tax Regs.; Rev. Rul. 64–54, 1964–1 C.B. (Part 1) 81. However, the provisions of section 117(b)(1) are inapplicable in the absence of a determination that the payment sought to be excluded first satisfies the requirements of section 117(a). *Elmer L. Reese, Jr.*, 45 T.C. at 413–415. No such determination has been made here.

*Decisions will be entered for the respondent.*

---

[2] Rev. Rul. 59–191, 1959–1 C.B. 40, although dealing with a superficially similar situation, is distinguishable. To be sure, it was there found that the "primary objective" of a scientific equipment company's scholarship program was "to help alleviate the shortage of scientists and engineers," but it was also found that the grantor company's "primary interest" was to "further the education of the [recipient]." Since the latter finding was dispositive, and since the scholarship program therein does not appear to have been designed to induce recipients to return to the particular grantor, the revenue ruling is distinguishable from the situation here where we have found that the payments in issue were made primarily for the benefit of the sponsoring companies.

[3] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

(b) LIMITATIONS.—

(1) INDIVIDUALS WHO ARE CANDIDATES FOR DEGREES.—In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.