JOHN T. LANCASTER AND MARY H. LANCASTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lancaster v. Commissioner
Docket No. 1302-75.
United States Tax Court
T.C. Memo 1978-72; 1978 Tax Ct. Memo LEXIS 445; 37 T.C.M. (CCH) 353; T.C.M. (RIA) 780072; February 23, 1978, Filed Cordell M. Parvin, for the petitioners. Carol K. Scott, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $537 in petitioners' Federal income tax for the year 1973. Petitioners have conceded the disallowance by respondent of a deduction for child support payments. The only issue presented for our decision is whether petitioner John T. Lancaster is entitled to exclude as a fellowship grant the amount of $3,600 of the stipend he received in 1973 from Roanoke Memorial Hospitals where he was a resident in general surgery. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. Petitioners John T. Lancaster and Mary H. Lancaster are husband and wife *446 whose legal residence was in Roanoke, Virginia, at the time they filed their petition in this case. They filed their joint Federal income tax return for 1973 with the District Director of Internal Revenue at Richmond, Virginia. John T. Lancaster (hereinafter referred to as petitioner) received his M.D. degree from Emory University in 1967. After completing his internship, petitioner was engaged in the general practice of medicine from 1968 until July 1971. Petitioner was appointed resident in general surgery at Roanoke Memorial Hospitals (hereinafter referred to as Roanoke Memorial) in July 1971, and was reappointed in July 1972, July 1973, and July 1974 for one year appointments. He was a second-year resident during the first half of 1973, and a third-year resident during the second half of 1973. During the years of his service at Roanoke Memorial petitioner was not a candidate for a degree. Roanoke Memorial provides patient care and education of interns and residents. Its surgery department provides a graduate training program in general surgery including extensive clinical experience in thoracic, cardiovascular, traumatic, plastic, oncologic, pediatric, and proctologic *447 surgery. The care of private patients is a function of the "medical team" composed of the attending surgeon and the resident. Pre- and post-operative care, diagnostic, and operative procedures are performed by both. The attending surgeon devotes substantial time and energy teaching and training the resident. Clinic service supervision is provided by an attending ward chief and the director of surgical education, who make regular rounds and are avilable for routine or emergency consultation and advice. During 1973 approximately 20,000 patients were admitted to Roanoke Memorial. There were approximately 48,000 out-patient clinic visits, 43,000 emergency visits, and 16,000 surgical procedures. Petitioner participated in conferences, classroom instruction, and patient care under the tutelage and guidance of the attending surgeon. During 1973 Roanoke Memorial employed four or five physicians who made up the hospital teaching staff. These physicians were in charge of the residency program. They were involved in student teaching with students from the University of Virginia; they were involved in continuing medical education programs for the attending staff; they taught interns, *448 served on various hospital committees; and they receive private patients of their own by referral or consultation. The professional staff of Roanoke Memorial are those physicians who have the right to practice at the hospital. The house staff are those residents and interns currently present at the hospital. When a resident has been assigned to an attending physician, the resident and the attending physician work together as a team in caring for patients. If an attending surgeon needs assistance with a patient, the surgeon can call upon a resident for help. The examination of the patient by several trained doctors who offer their views often results in improved patient care, even though one doctor may have more experience than others. Residents often care for patients and make rounds without the attending surgeon being present. The attending surgeon sometimes directs the resident to do something in terms of patient care, such as changing dressings or examining sutures, when the residents are making rounds alone. In addition, the residents occasionally learn something about the patients which the attending surgeon did not know, which may be helpful in terms of patient *449 care. The residency program at Roanoke Memorial helps attract a better grade of physicians to practice at the hospital. Petitioner entered into a contract with Roanoke Memorial accepting an appointment as a first-year surgical resident. He agreed to fulfill his duties and obey the rules of the hospital and medical staff. In return, compensation was agreed to at the rate of $550 per month, with room, meals, and laundry being provided. This contract was executed for the first-year surgical residency program, and was continued by oral agreement for the second, third, and fourth years of the residency program. As a member of the general surgery residency program at Roanoke Memorial, petitioner was eligible for paid vacation, medical benefits, paid medical malpractice insurance, health insurance, and scrub-suit uniforms. These benefits differed from those provided other regular hospital employees. In addition, income and social security taxes were withheld from petitioner's paychecks. Petitioner was generally present at the hospital Monday through Friday from 6:30 a.m. to 9:00 p.m. and Saturday from 6:30 a.m. to 12:00 noon. He was also on call every third night and every *450 third weekend. His schedule was set by the attending surgeon although lectures, seminars, and meetings usually took precedence. The amount of the cash stipend petitioner and all other residents received from Roanoke Memorial was based on the years of service. These amounts were not geared to the financial needs of the recipient, but were the same for all. Hospital patients are not directly billed for the services performed by residents. Instead, such services, like those performed by nurses and other hospital personnel, are an indirect cost which is part of the hospital overhead, recovered from patients as part of the general charge structure, which includes the daily room charge. In the annual report of Roanoke Memorial for 1976 the residents were included in a computation of benefits paid to employees, which included paid sick leave, holidays, vacations, and life insurance. The annual report included residents in a category entitled "Accrued Salaries and Payroll Taxes." The first-year resident is assigned to an attending surgeon and is permitted to perform operative procedures or portions of procedures consistent with his capabilities and experience, under the immediate *451 supervision of the attending surgeon. The first-year resident makes daily working and teaching rounds with the attending surgeon in addition to work rounds which the resident makes alone. The resident writes the orders and attends to the patient's needs including wound care, again under supervision. He supervises and teaches interns and students. He is on "first call" for emergency room and surgical consultations daily and every third night. Night call consists of answering surgical consultations in the emergency room, consulting with the intern on in-patient problems, and assisting with emergency surgery. The resident also participates in the out-patient surgical clinic. The second-year resident rotates to the University of Virginia medical center. For 6 months of the second year he is involved in laboratory research activity such as experimental surgery, under the direction of members of the department of surgery. For the remaining 6 months of the second year at the University of Virginia the resident has clinical duties on the thoracic, cardiovascular, and intensive care services, where he cares for the critically ill. He performs operations commensurate with his level of *452 training and competence. The third-year resident has increased responsibility for patient care and the performance of surgical procedures. His teaching and supervision of first-year residents, students, and interns is increased.He is consultant to the first-year resident for emergency room and floor problems. He performs a major portion of the surgery for the emergency cases about which he is consulted. He rotates through the clinic surgical service where he has primary care of the patients he admits from the clinic and the emergency room, under the supervision of the senior resident and the attending surgeon. The third-year resident is also responsible for organizing the residents' rounds program and for organizing the cases to be discussed at the pathology conferences. The fourth-year resident is in charge of the clinical service. He assumes full responsibility for the care of the clinic service patients with supervision by the attending surgeon assigned. The senior resident supervises assistant residents, interns, and students assigned to the clinic surgery service; he answers all clinic service surgical consultations; he makes daily rounds with the attending physician, *453 including teaching rounds and/or work rounds; he is responsible for surgical procedures; he performs administrative resident duties which include planning of night schedules and operating room assignments; he is responsible for surgical out-patient clinics; and he has teaching duties and makes daily teaching rounds with interns and students assigned to the clinical service. Residents were given additional responsibility as they became more experienced in terms of patient care. When residents are "on call," they answer problems that might arise on the floor. The call station generally runs from 6:00 p.m. until 7:00 or 8:00 a.m. Professional staff members are not generally on the floor of the hospital at night. Residents are the only physicians on the floor 24 hours a day. Having physicians on the floor at all times is a benefit to patient care. Subject to review by the attending surgeon, petitioner wrote treatment orders for patient care, took physicals and medical histories, made diagnoses, wrote progress notes, occasionally dictated case summaries for discharge notes, commenced administration of intravenous fluids when regular hospital personnel encountered technical difficulties, *454 inserted nasal gastric tubes, assisted in operations, changed dressings, removed sutures, performed duties in the out-patient clinic, and supervised interns and younger residents. In the operating room the resident works under the supervision of the attending surgeon and participates in the operative procedure. Petitioner began his residency as an observer performing few operations. As the attending surgeons developed confidence in petitioner, he gradually did more and more of the operations under their supervision. When he finished his surgical training, he was performing most of the surgery that was done while being observed by the attending surgeon. There are nine regular operating rooms at Roanoke Memorial, as well as a cystoscopy and a diagnostic procedures room. Thus, eleven rooms are devoted to operational procedures. The number of operations performed there keeps the rooms busy for an 8-hour shift per day. In 1977 the hospital provided five surgical assistants for operations; these persons were generally registered or practical nurses trained by the hospital. They are regular employees of the hospital. During 1973 the hospital did not have surgical assistants available *455 but used surgical scrub nurses to assist in operations. The surgical assistants are on duty on a regular rotation, with a shift generally consisting of hours from 7:00 a.m. until 3:00 p.m. When all the operating rooms are busy, the surgical residents are called upon to assist in some of the operating rooms. In addition, the residents are available to assist in emergency operations. The rules and regulations of the professional staff of Roanoke Memorial provide that when major surgery is being performed, "there shall always be a practitioner assistant who is capable of protecting the patient in the event of incapacity of the surgeon until a qualified surgeon can be summoned." This rule was instituted in order to provide emergency coverage for an attending surgeon if he were not able to complete a procedure. The responsibility for providing the practitioner assistant is on the attending surgeon. Generally, it is better to have surgical residents assisting in operations rather than trained surgical assistants. Petitioner performed approximately 500 operations under the direction or supervision of the attending surgeon during 1973. The emergency room is run by a group of *456 private physicians known as the emergency room associates. The doctor on duty is a member of the hospital's professional staff. Also present in the emergency room are two first-year residents, but not necessarily surgical residents. When a surgical problem arises in the emergency room, the surgical residents act as consultants when they are on call. Third-year or second-year residents act as consultants to the first-year residents for the emergency room and floor problems. When a surgical resident is called, he examines the patient in the emergency room and determines whether or not to consult the attending surgeon. If the resident can take care of the problem, he does not have to call the attending surgeon at night. The attending surgeons are generally not present in the hospital at night in the absence of an emergency. In addition, the second and third-year surgical residents perform operations for those emergency room cases about which they are consulted, subject to supervision. During his residency petitioner was a surgical consultant to the emergency room. He was subject to call to examine and evaluate any patient suspected of having a surgical problem. If the patient *457 had a severe problem, petitioner would begin treatment before the attending surgeon arrived. Petitioner occasionally worked in the emergency room at Rocky Mount, a neighboring hospital. He was paid $10 to $12 per hour for his services there. The clinic service is headed by a fourth-year resident, or chief resident. The clinic service is what one might consider the fourth-year resident's private practice. He is responsible for the management of the clinic, under the supervision of one of the attending surgeons assigned. Petitioner was chief resident of the clinic service during his fourth year of the surgical residency program. As chief resident he evaluated patients, and he had the prerogative to discharge a patient from the emergency room. If he chose to admit the patient, he would generally inform the attending surgeon. If an operation had to be performed, the attending surgeon would come to the hospital. The attending surgeon did not necessarily involve himself physically in the operation, but was available in the operating room if needed. Petitioner also acted as chief resident for the surgical out-patient clinic during the fourth year of his residency. Approximately *458 six people, in addition to the attending surgeon, would be in the clinic when it was open on any particular day. These were all residents or students. The surgical residents assigned to the out-patient clinic had primary care for the patients they admitted from the clinic, continuing to treat them through the surgical procedure, subject to the supervision of the attending surgeon. Professional staff members assigned to the clinical service on a rotational basis review and sign histories, physicals, and discharge summaries after satisfactory completion by the residents. The professional staff generally does not duplicate what has been done in terms of patient care by the house staff. If there were no residency program at Roanoke Memorial, additional attending physicians would have to be present at the out-patient clinic in order to take care of the clinical service patients. Patients at Roanoke Memorial receive better care because of the surgical residency program. On his Federal income tax return for 1973 the petitioner claimed an exclusion of $3,600 as a fellowship or scholarship grant under section 117 of the Code. Respondent disallowed the claimed exclusion. ULTIMATE *459 FINDING OF FACT The primary purpose of the payments made by Roanoke Memorial to petitioner in 1973 was to compensate him for services which directly benefited the hospital. OPINION The issue in this case, like that in many similar cases which have preceded it, is essentially factual. Therefore, our ultimate finding of fact is dispositive. Section 117(a)(1) provides for the exclusion from gross income of any amount received "as a fellowship grant," subject to the limitations contained in section 117(b). The word "fellowship" is not defined in the statute, but section 1.117-3(c), Income Tax Regs., provides: A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. According to section 1.117-4(c), Income Tax Regs., section 117 does not permit the exclusion of payments which represent compensation for past, present, or future services or for services which are subject to the direct supervision of the grantor, and payments made to an individual to enable him or her to pursue studies primarily for the benefit of the grantor. In Bingler v. Johnson,394 U.S. 741, 751 (1969), *460 the Supreme Court upheld the validity of this regulation and stated that the definition in the regulation is consistent with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quidproquo from the recipients." The primary purpose of the grantor in making the payments determines whether they represent a fellowship to enable petitioner to further his education or compensation to petitioner for his services. Bailey v. Commissioner,60 T.C. 447, 451 (1973). This case is another in the plethora of cases where resident physicians who assist in the care of patients seek to exclude, as a fellowship grant within the purview of section 117, a portion of the money they receive. Although they have met with relatively little success in the past, litigation seems to continue unabated. Petitioner contends that the portion of the stipend which he received in 1973 represented a fellowship grant because, during that time, he studied, mostly, and performed only incidental services for Roanoke Memorial. We must examine the residency program as a whole to *461 determine whether the stipend constitutes a fellowship grant. Ehrhart v. Commissioner,57 T.C. 872, 883 (1972), affd. 470 F. 2d 940 (1st Cir. 1973). The extent of petitioner's patient-care services as a surgical resident makes it abundantly clear that the payments he received were not a fellowship grant. See Weinberg v. Commissioner,64 T.C. 771, 777 (1975); Fisher v. Commissioner,56 T.C. 1201 (1971); Anderson v. Commissioner,54 T.C. 1547 (1970); and Proskey v. Commissioner,51 T.C. 918 (1969), with Bieberdorf v. Commissioner,60 T.C. 114 (1973); Bailey v. Commissioner,supra;Vaccaro v. Commissioner,58 T.C. 721 (1972); and Phillips v. Commissioner,57 T.C. 420 (1971). There is no indication in this record that Roanoke Memorial did not get, in the value of petitioner's services, every penny's worth for what they paid him. In our opinion that is quidproquo. Graduate medical education is taught largely on the basis of personal health care services to patients. However, the fact that this surgical *462 training was a valuable educational experience for petitioner does not change the characterization of the stipend. Proskey v. Commissioner,supra at 925. And it is irrelevant that the hospital and the attending surgeons considered the residents to be students. The "primary purpose" standard of the regulations relates to the purpose for which the payments are made. Hembree v. United States,464 F. 2d 1262 (4th Cir. 1972). The motivation of petitioner in accepting these stipends is not determinative. Proskey v. Commissioner,supra.If the payments are made to compensate services, then they are not excludable even though they also further the education and training of the recipient. "Payments made for the 'primary purpose--to further the education and training of the recipient' are fellowship grants unless--and the unless is a big unless--the amount provided for such purpose represents compensation." Parr v. United States,469 F. 2d 1156, 1159 (5th Cir. 1972). The facts herein establish to our satisfaction that the amounts paid to petitioner were compensation for services rendered under the direction *463 or supervision of the hospital or its staff surgeons. Petitioner did in fact perform useful and valuable services for Roanoke Memorial. He was present at the hospital some 78 hours per week and, in addition, was on call every third night and every third weekend. As a member of a surgical team, with his attending surgeon, he performed pre- and post-operative care, diagnostic services, and operative procedures consistent with his abilities and experience. He made daily working and teaching rounds. As a second-year resident he treated clinical patients on the cardiovascular and intensive care services. In his third year he performed thoracic and vascular surgery, with increased responsibility for patient care and the performance of surgical procedures. He taught and supervised interns and less experienced residents. He acted as consultant to the first-year resident for emergency room and floor problems. He performed a major portion of the surgery for the emergency cases about which he was consulted. He had primary care for the patients he admitted from the clinic and emergency room, under supervision of the surgeon. In his fourth year he was in charge of the clinic service, again *464 under supervision. Except for the attending surgeon, the surgical clinic was manned entirely by residents and interns. According to his own testimony he performed about 500 operations in 1973. Even if Roanoke Memorial could have survived without the surgical residency program, the fact remains that the hospital did use petitioner's services and paid for them. The fact that an employee may be dispensable does not render his salary noncompensatory. Fisher v. Commissioner,56 T.C. 1201 (1971). Accordingly, on the basis of the evidence contained in this record, we have found and hold that the payments petitioner received from Roanoke Memorial were compensation for services rendered, and no portion of such payments were excludable from gross income as a fellowship grant. Decision will be entered for the respondent.