PHILLIP E. KOCH and MARTHA R. KOCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Koch v. Commissioner
Docket No. 9616-76.
United States Tax Court
T.C. Memo 1979-147; 1979 Tax Ct. Memo LEXIS 378; 38 T.C.M. (CCH) 650; T.C.M. (RIA) 79147; April 16, 1979, Filed John L. Thompson, for the petitioners. Stanley *379 H. Smith, Jr., for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined a deficiency of $397.41 in petitioners' income tax for 1974. Petitioners dispute only that portion of the deficiency attributable to respondent's determination that payments received by Phillip E. Koch, while participating in an oral surgery residency program, did not qualify for exclusion from gross income under section 117 of the Internal Revenue Code. [1]
All the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners filed a joint individual income tax return for the taxable year 1974 with the Internal Revenue Srevice Center, Chamblee, Georgia. Petitioners were residents of Augusta, Georgia, on the date the petition herein was filed. Petitioner Phillip E. Koch (hereinafter petitioner) graduated from dental school on July 1, 1974, and began a three-year oral surgery residency program *380 at the Medical College of Georgia, Augusta, Georgia. The three-year program was intended to qualify petitioner to become board certified as an oral surgeon. The residency program involved classroom work and assignments to rotations at Talmadge Memorial Hospital, Veterans' Administration Hospital, University Hospital, and certain oral surgery outpatient clinics, all of which are located in Augusta, Georgia. Petitioner was required to sign a one-year house officer agreement prior to the beginning of each one-year period of the residency program. Under the agreement for the period July 1974 through June 1975, the petitioner was to be paid $10,100 per annum; under the July 1975 through June 1976 agreement, $11,100; and under the July 1976 through June 1977 agreement, $11,600. The increases in payments were not based on his financial needs. The agreements also provided that petitioner was entitled to two weeks vacation with pay per year; free parking; free laundry service for certain uniforms; and hospitalization, malpractice, and life insurance. Six residents participated in the oral surgery residency program which began in July 1974. Yearly payments to two of the six residents *381 were made by Talmadge Hospital, while the Veterans' Administration Hospital paid one resident and the University Hospital paid the remaining three. From July 1, 1974, through June 30, 1975, petitioner was paid by the University Hospital, although all three of the agreements which he signed were captioned "Talmadge Hospital House Officer Agreement." State and Federal taxes were withheld from the payments petitioner received under the house officer agreement in 1974. If petitioner left the residency program before three years elapsed, he was under no obligation to repay any sums received under the house officer agreements. However, the Medical College of Georgia anticipated that each resident admitted to the program would participate in it for the entire three years. Petitioner did complete the program and is now a practicing oral surgeon in Georgia. He was not required to enter the employ of the Medical College of Georgia or the three hospitals involved in the residency program upon completion of the program.
In the house officer agreements, the hospital agreed to provide a suitable environment for educational experiences in the special area of residency. Petitioner agreed to *382 perform satisfactorily the customary services of residency; to conform to hospital policies, procedures, and regulations; and to refrain from engaging in outside remunerative work without express permission of the chairman of the oral surgery department. During the first two months of the residency program, petitioner was required to spend much of his time atending classes in anatomy and physical diagnosis. Petitioner also spent some of his time during this period observing third-year residents in the oral surgery clinics. Occasionally, under direct supervision, he would perform minor surgical procedures on clinic patients. At the end of the first two months of the residency program, petitioner was required to submit a report to the school on his observations. In the third month of his residency, petitioner was required to participate in a full-time pulmonary medicine rotation, and in the fourth month in a full-time gastrointestinal rotation, at the Veterans' Administration Hospital. During this time, petitioner was part of the medicine service at the Veterans' Administration Hospital, was listed on the house staff roster, and was covered by malpractice insurance, on which *383 he did not pay the premiums. He had regular assigned duty hours, received one free meal per day while on duty, and was required to be on call, and sleep at the hospital, every third night. Hospital doctors supervised and instructed him in his various duties, which included physical diagnosis of patients and writing of their medical histories. Throughout the third and fourth months, petitioner received oral examinations to insure that he was satisfactorily completing his courses of study. During the fifth and sixth months of the residency program, petitioner was assigned to the oral surgery clinic at Talmadge Memorial Hospital where he carried out assigned duties, including some minor oral surgery suprevised by the senior resident and the attending staff physician. During the first six months of his residency program, petitioner's time spent in fulfilling the requirements of the program was allocated as follows: Classroom work
70 percent
Observation
10-15 percent
Patient care
10-20 percent
If a resident had been unavailable to perform his assigned duties during his first six months in the residency program, the hospitals and clinic involved would not have *384 been required to hire additional staff physicians in order to provide adequate and efficient patient care. Thereafter, if a resident had failed to fulfill his responsibilities, the hospitals and clinics would have been required to hire additional physicians. After the first six months in the residency program, petitioner was given increasing responsibilities until he became the doctor in charge of a patient's care, rather than being supervised by the doctor in charge. He spent his seventh through ninth months in a full-time anesthesia rotation at the University Hospital and Talmadge Hospital, where, as his experience increased, he was given greater responsibility for performing the duties of a fully qualified anesthesiologist. During the tenth through the twelfth months of the residency program, petitioner was again assigned to the oral surgery service. His responsibility for patient care and for performing surgical operations in the oral surgery clinics and operating rooms increased throughout this period. Petitioner spent the first month of his second year in a full-time neurosurgery rotation in which his duties included examining patients, diagnosing neurological disorders, *385 and writing up patient histories, diagnoses, and treatments. The remainder of petitioner's second year and his entire third year in the residency program involved a full-time assignment to the oral surgery service where petitioner rendered patient care, performed major surgical operations, taught first-year residents, supervised less experienced residents, and carried out administrative duties. During most of petitioner's last two and a half years in the residency program, he was listed on hospital or clinic house staff rosters, was covered by malpractice insurance on which he did not pay premiums, had regular assigned duty hours, received one free meal per day while on duty, and was on call and required to sleep at a hospital every third night. Petitioner performed approximately 1,000 operatons in the outpatient clinic and 250 operations in hospital operating rooms during his residency. A substantial number of such operations were performed after the first six months of the residency program. During the entire period of the residency program, petitioner, along with the other residents, was required to teach his share of a weekly one-hour class summarizing recent publications *386 in medical and dental journals relating to oral surgery, a weekly one-hour lecture on substantive oral surgery topics, and a two-hour weekly instructional course on oral surgery topics. All residents were also required to assist a professor in teaching dental students. Approximately five or six days of petitioner's time per year were devoted to teaching. The issue for decision is whether $1,800 paid to petitioner in 1974, [2] during the first six months of his participation in an oral surgery residency program, qualifies for exclusion from gross income under section 117. [3]
*387 Section 117 excludes from gross income any amount received as a scholarship or fellowship grant. Respondent concedes that the applicable limitations on exclusion of scholarships and grants from income, contained in section 117(b)(2), have been met and that the only issue presented is whether the payments constituted a scholarship or grant. Section 1.117-4(c), Income Tax Regs., provides that "any amount paid * * * to * * * an individual to enable him to pursue studies or research" shall not be considered an amount received as a scholarship or fellowship grant "if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." The test to be applied under the regulation is whether the primary purpose for making the payments to the taxpayer was to educate and train him in his individual capacity or to compensate him for services rendered. Weinberg v. Commissioner,64 T.C. 771, 776 (1975); Reese v. Commissioner,45 T.C. 407, 411 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). In Bingler v. Johnson,394 U.S. 741, 751 (1969), *388 the Supreme Court sustained the validity of section 1.117-4(c) of the regulations, emphasizing that its thrust is to deny an exclusion for payments given in return for a quid pro quo, as distinguished from "relatively disinterested, 'no-strings' educational grants." The determination as to whether any particular payments were made in order to obtain a substantial quid pro quo from the recipient is necessarily factual in nature. Phillips v. Commissioner,57 T.C. 420, 425 (1971); Proskey v. Commissioner,51 T.C. 918, 922 (1969). Petitioner's term as a resident extended from July 1974 through June 1977. Petitioner admits on brief that in 1975 and 1976 he was engaged primarily in patient care, but contends that his activities in the latter part of his residency do not reflect on the nature of the payments he received in 1974. He argues that since he served only the first six months of his three-year residency in 1974, months devoted in large part to study and observation, the primary purpose of the payments he received in 1974 was the furtherance of his education and training in his individual capacity. We disagree. We believe that it is necessary *389 to consider the residency program as a whole in order to evaluate the nature and purpose of the payments received by petitioner in 1974 for his participation in the program. See and compare Leathers v. United States,471 F.2d 856, 861 (8th Cir. 1972); Woddail v. Commissioner,321 F.2d 721, 724-725 (10th Cir. 1963), affg. T.C. Memo. 1962-232; Dietz v. Commissioner,62 T.C. 578, 585 (1974); Ehrhart v. Commissioner,57 T.C. 872, 883 (1972), affd. 470 F.2d 940 (1st Cir. 1973). [4] To consider the first six months of the program in isolation from the rest would ignore the fact that, in virtually any skilled job, a new employee is less productive than an experienced one and must spend some time in on-the-job training. In the process, the employee acquires new skills and education. But, it would be naive to believe that an employer's motive in paying an employee during a training period is to allow the employee to obtain an education. Such payments are made by the employer in expectation of future services and it is the payor's motive for making the payments, not the recipient's motive for accepting *390 them, that determines whether the payments represent compensation. Adams v. Commissioner, 71 T.C.     (Dec. 28, 1978); Proskey v. Commissioner,supra at 925. [5] Although a resident was under no obligation to remain in the program after his first year, the Medical College of Georgia anticipated that any resident beginning the program would, in fact, serve the entire term of residency, and, therefore, petitioner's activities throughout his residency are relevant herein. The record clearly indicates that, in each year of his residency, petitioner was expected to, and did, render services of substantial value in exchange for the stipend he received. Thirty-two of the thirty-six months of petitioner's residency were spent *391 in full-time hospital and clinic rotations, examining, diagnosing, and treating patients. During those months, he was listed on hospital or clinic house staff rosters, was covered by malpractice insurance, had regularly assigned duty hours, received one free meal per day while on duty, and was on call and required to sleep at a hospital every third night. Petitioner also had teaching and administrative responsibilities. He performed more than 1,000 operations during the residency program. In the first year alone, petitioner spent eight months in full-time hospital and clinic rotations. By the end of the first year, he had significant responsibility for rendering patient care and his services were necessary to efficient operation of the hospitals and clinics at which he worked. In addition, as petitioner himself notes, throughout his residency, his relationship with the hospitals and clinics involved in the program had many of the characteristics of an employer-employee relationship. Petitioner signed a house officer agreement each year of the program which provided him with an annual stipend.The stipend was increased every year in amounts unrelated to his financial need. He *392 also received fringe benefits including malpractice coverage, hospitalization insurance, life insurance, and two weeks paid vacation. Parts of the payments were withheld for FICA and income tax purposes. On his part, petitioner agreed to refrain from any outside remunerative work, to adhere to hospital rules, and to fulfill the duties assigned to residents unless he obtained express permission from the chairman of his department. All of the foregoing factors have been held to be indicative of the existence of an employer-employee relationship. See Parr v. United States,469 F.2d 1156, 1158 n.5 (5th Cir. 1972); Adams v. Commissioner,supra, and cases cited therein; Brubakken v. Commissioner,67 T.C. 249, 259 (1976). [6] Compare Bailey v. Commissioner,60 T.C. 447, 452 (1973).
At the very least, the scope of our examination should encompass the entire one-year period of the contract under which the 1974 payments were made, since petitioner was contractually bound to perform the services required of him for a year and his stipend was fixed on *393 an annual basis. But, payments may be intended as compensation for future services, even where there is no contractual undertaking to render future services, if there is a clear expectation that the recipient will do so. Ehrhart v. Commissioner,supra at 882; MacDonald v. Commissioner,52 T.C. 386, 393 (1969). Even if we were to confine our examination to the first six months of the residency program, we would conclude that petitioner performed substantial services in exchange for which he was compensated. We note our difficulty in reconciling the stipulation that 70 percent of petitioner's responsibilities in the first six months of the residency program involved classroom work with the facts (also stipulated) that petitioner spent the third and fourth months of the program in full-time hospital rotations, on call every third night, and spent at least part of the fifth and sixth months working in the oral surgery clinic. That petitioner's work during his first six months as a resident was directly supervised by more experienced doctors and was not essential to efficient operation of the hospitals and clinics (i.e., replacement physicians *394 would not have been hired (see p.7, supra)) is not inconsistent with a conclusion that the payments he received were compensatory in nature. See Brubakken v. Commissioner,supra at 256. See also, Fisher v. Commissioner,56 T.C. 1201, 1215 (1971), wherein we stated that "even if the [hospital] could do without residents, it did not do without them; it used their services, and it paid for them." [7]
Weighing all the facts, we conclude that, after an initial training period, petitioner was primarily engaged in rendering patient care and provided the hospital and clinics with valuable and substantial services in return for which he received a stipend. To the extent that payments to petitioner in his first six months exceeded the value of his services to the hospitals and clinics during those months, those payments were made in the expectation that petitioner would render future services, both those which he was contractually bound to perform under the one-year house officer agreement and those which the hospitals *395 and clinics anticipated he would perform in the last two years of his residency. In short, we hold that the payments received by petitioner in 1974 represented compensation for substantial services performed by him in 1974 and thereafter and are, therefore, not excludable from income under section 117. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year in issue, unless otherwise stated.↩
2. Petitioner received $5,050.02 in 1974 for participation in the residency program but, in accordance with section 117(b)(2)(B)↩, limited his deduction to $300 times the number of months of his participation in the program during the taxable year. 3. Section 117 provides in relevant part: SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. -- In the case of an individual, gross income does not include -- (1) any amount received -- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, including the value of contributed services and accomodations; and (2) any amount received to cover expenses for -- (A) travel, (B) research, (C) clerical help, or (D) equipment, which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient.
(b) Limitations. -- * * *
(2) Individuals who are not candidates for degrees. -- In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B). (A) Conditions for exclusion. -- The grantor of the scholarship or fellowship grant is -- (i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a), (B) Extent of exclusion. -- The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4)).↩
4. See also, Lancaster v. Commissioner,T.C. Memo. 1978-72↩. 5. Petitioner's argument that to consider the nature of his activities during his entire residency is an elevation of form over substance is without merit. On the contrary, we find his approach of isolating the six months of the three-year program which occurred in 1974, and disregarding the remaining two and a half years, to be rigid and formalistic.↩
6. See also, Ulvestad v. Commissioner,T.C. Memo. 1979-60↩.
7. See also, Ulvestad v. Commissioner, footnote 6, supra; Hof v. Commissioner,T.C. Memo. 1979-55↩.